WITTNER, POGER, ROSENBLUM & SPEWAK, P.C., et al., Appellants,

v.

The BAR PLAN MUTUAL INSURANCE COMPANY, Respondent.

No. 80386.

Supreme Court of Missouri, En Banc.

June 16, 1998.

———

Jack B. Spooner, St. Louis, for appellants.

Brent W. Baldwin, Bruce J. Weingart, St. Louis, for respondent.

PRICE, Judge.

This is an unfortunate case in which a decree of divorce was entered by default against a client of a law firm. Believing that a claim would not be filed against it, the law firm did not report the event to its malpractice carrier, even after two letters of complaint from the client. Instead, the firm unsuccessfully attempted to vacate the decree and obtain a new trial. More than fifteen months after the default, upon receipt of notice from another attorney that he had been retained to pursue a malpractice claim, the law firm reported the claim to its carrier who denied coverage. The law firm then filed a petition for declaratory judgement. The trial court ruled in favor of the carrier. We affirm.

## I.

Nina Herbert contacted N. Scott Rosenblum in March of 1991 concerning the dissolution of her marriage. Rosenblum practiced as a partner in the Wittner, Poger, Rosenblum and Spewak law firm. He asked an associate of the firm, Ramona Marten, to assist him in representing Ms. Herbert.[1] Ms

---

1. At times throughout this opinion, Wittner, Po-  ger, Rosenblum & Spewak, N. Scott Rosenblum,

Herbert told Mr. Rosenblum that she just wanted to end her marriage and obtain a few things. She specifically mentioned some wedding gifts, a credit union debt, a dining room table and some telecommunication stock.

A short time after her initial consultation, Ms. Herbert telephoned to indicate she had been served with a summons and petition for divorce filed by her husband in Bexar County, Texas. She scheduled a meeting with Ms. Marten for April 1, 1991.

On or about May 1, 1991, Ms. Martin contacted the court in Bexar County, Texas to verify the date of Ms. Herbert's service. She also attempted to contact Frank Hill, the attorney representing Ms. Herbert's husband, on that day and for the next several days, but failed to reach him by telephone.

On May 6, 1991, the Circuit Court of Bexar County entered a Final Decree of Divorce against Ms. Herbert by default. Ms. Herbert received a copy of the decree on May 13, 1991. She immediately telephoned the law firm. Ms. Marten contacted the court to confirm the entry of the decree and began to look for a Texas attorney in case further proceedings were necessary.

On May 15, 1991, Mr. Rosenblum, Ms. Marten, and Ms. Herbert met. They reviewed the divorce decree in detail. Ms. Marten's notes indicate that "nothing major needed to be changed" and both Ms. Marten and Mr. Rosenblum testified that they did not believe that Ms. Herbert was angry or upset. They did recall that Ms. Herbert had some questions about certain property. As a result of the meeting it was decided that Ms. Marten would attempt to discuss settlement with attorney Frank Hill and if this was not successful they would attempt to set aside the decree.

Attorney Hill indicated that he could not recommend a settlement to his client. Mr. Rosenblum retained attorney Rosa Marie Cabeza–Gil to pursue a motion for new trial. In support of the motion, Ms. Marten executed an affidavit on May 29, 1991, that stated the default was entered "due to my excusable neglect or mistake". The law firm paid Ms.

Cabeza–Gil's fees. Mr. Rosenblum did not believe that Ms. Herbert should have to pay this expense because "it wasn't her fault that the default was entered." On June 13, 1991, Mr. Rosenblum wrote to Ms. Cabeza–Gil and stated that Ms. Herbert would settle her claims against her former husband for $60,-000.

The motion was denied on June 14, 1991. On June 20, 1991, Ms. Herbert wrote to Mr. Rosenblum. She complained about his failure to communicate with her. She concluded the letter by stating:

> "Your negligence, not only hurt me financially, but this is the biggest insult I have ever got.
>
> Scott,
>
> You must advise me in writing, of all the options and in case one or two options fail, how you are going to take care of it. Within 7 days.
>
> I do not want to be brushed off any more.
>
> I have not received what is mine, because of your professional negligence.
>
> I have been going through an emotional distress because of all this.

*   *   *   *   *

> I do understand that maybe by being busy you neglected my case. But my intentions with you were honorable from the beginning, and I expected then and expect now the same as a return from you."

Mr. Rosenblum replied to Ms. Herbert's letter on August 1, 1991. Among other things, Mr. Rosenblum stated, "Please be assured that I have not intended to insult you or 'brush you off' in any way."

Mr. Rosenblum retained attorney Joe Chris Lopez to pursue an appeal. Again, the firm paid Lopez's fees because it wasn't Herbert's fault that the default had been entered.

On January 13, 1992, Herbert wrote a second letter to Rosenblum. She stated:

> ...when I came in with my brother Paul Gismegian, you told us that you are filing

___

and Ramona Marten will be collectively referred to as the law firm or the firm.

for an appeal on your own expense and you will take it all the way to the Supreme Court if you have to. And when I asked you if that is not going to work, what then? You said that I would have to file a suit against you.

I knew then and I know now that this is a very strong possibility.

Herbert concluded her letter by stating:

Maybe you thing(sic) that I have no other choice but to accept your silence. But you are wrong. I could file a lawsuit against you right now. Since I do not have any proof that you have even file(sic) for an appeal. So please Scott, do not challenge me. Mail me a letter with all the information before Jan 24 1992, and start keeping me inform(sic) on every event. Thank you."

On February 12, 1992, the Fourth Court of Appeals, District of Texas affirmed the trial court. A motion for rehearing was denied on May 29, 1992. Mr. Lopez advised Ms. Marten that further appeals would not be advisable and might result in sanctions.

Mr. Rosenblum, in turn, advised Ms. Herbert that he would no longer pursue any appellate remedies. She met with him on June 30, 1992. At the meeting Mr. Rosenblum inquired if there was any specific property she wanted him to obtain from her former husband. Mr. Rosenblum recalls that all Ms. Herbert wanted was some telecommunication stock. Ms. Herbert informed Mr. Rosenblum that she had an appointment with attorney Charles Shaw to discuss a malpractice action.

The next communication from Ms. Herbert to Mr. Rosenblum and Ms. Marten was a letter from attorney Paul Passanante. The letter was dated September 14, 1992, and advised that Passanante had been retained to pursue a legal malpractice claim. Mr. Rosenblum first notified The Bar Plan Mutual Insurance Company of the claim by letter dated September 16, 1992. In the letter, Mr. Rosenblum outlined the history of the claim and stated his belief that Ms. Herbert suffered little or no damages. In renewing the policy for the 1992/1993 policy year, the firm had not disclosed any information concerning Ms. Herbert to the Bar Plan. By identical

letters to Mr. Rosenblum and Ms. Marten, dated January 6, 1993, the Bar Plan denied coverage stating, in part, that "...it appears you were aware of an act, error or omission which may give rise to a claim prior to the application of May 26, 1992, as well as prior to the inception date of your policy of insurance."

The firm, Mr. Rosenblum and Ms. Marten filed suit against the Bar Plan in the Circuit Court of St. Louis County. After trial, the court entered judgement declaring that "the Defendant does not owe any duty, legal, equitable or otherwise to the Plaintiffs".

## II.

The Bar Plan Mutual Insurance Company insured the law firm continuously since 1984. It issued claims made professional insurance policies to the Wittner, Poger, Rosenblum & Spewak law firm effective from July 30, 1991, until July 30, 1992 (the 1991/1992 policy) and from July 30, 1992 until July 30, 1993 (the 1992/1993 policy). Mr. Rosenblum and Ms. Marten were two of the named individual insureds on both policies. The policies contained the following language:

In the "The Coverage" section, the policies stated:

1. PROFESSIONAL LIABILITY AND CLAIMS MADE CLAUSE:

The Company will pay on behalf of an Insured all sums in excess of deductible amounts stated in the Declarations which an Insured shall become legally obligated to pay as damages as a result of CLAIMS FIRST MADE AGAINST AN INSURED DURING THE POLICY PERIOD AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD by reason of any act or omission by an Insured acting in a professional capacity providing legal services.

PROVIDED ALWAYS THAT such act or omission happens:

A. during the Policy Period, or

B. prior to the Policy Period, provided that prior to the effective date of this policy:

(1) An Insured did not give notice to any prior insurer of any such act or omission: and

(2) An Insured had no basis to believe that the Insured had committed such an act or omission.

The policies also contained a clause that stated:

3. DISCOVERY CLAUSE:

If during the Policy Period or any Extension Period elected hereunder, an Insured first becomes aware of a specific act or omission in professional services for which coverage is provided under this policy and during the Policy Period, or any Extension period, gives written notice to the Company of:

A. the specific act or omission; and

B. the damage which has or may result from such act or omission; and

C. the circumstances by which the Insured first became aware of such act or omission;

then any Claim that may subsequently be made against an Insured arising out of such act or omission shall be deemed for the purposes of this insurance to have been made during the Policy Period, or any Extension Period elected hereunder. The Insured shall cooperate fully with the Company as provided in CLAIMS 1. and 2. And any investigation conducted by the Company or its representatives shall be subject to the terms set forth in this policy.

The policies also contained a corollary exclusion clause that provided:

1. THE POLICY DOES NOT PROVIDE COVERAGE FOR ANY DAMAGES ARISING OUT OF:

\* \* \* \* \*

K. A claim against an individual Insured(s) who before the policy effective date knew, or reasonable should have known, of any circumstance, act or omission that might reasonably be expected to be the basis of that Claim.

Under "OTHER CONDITIONS" the policies provided:

1. APPLICATION:

By acceptance of this policy, all Insureds agree that the representations in the declaration letter and Applications attached to and hereby made part of this policy are true and complete to the best of the knowledge of all Insureds. This policy is issued in reliance upon the truth of such representations and all Insureds warrant that no facts have been suppressed or misstated. This policy embodies all agreements existing between Insured and the Company and any agents of the Company relating to this insurance.

Under "DEFINITIONS" the policies stated:

"Claim" means receipt by an Insured of a demand for money or services, the service of suit or the institution of arbitration proceedings against the Insured. Two or more demands arising out of a single act or omission or a series of related acts or omissions shall be treated as a single claim.

### III.

The policies at issue are *claims made* insurance policies. *Occurrence* insurance policies generally provide coverage for an event that occurs during the policy period, regardless of when a claim is asserted. Claims made policies do not. Instead, claims made policies generally are triggered by the date the claim is made upon the insured. *See generally, Continental Casualty Co. v. Maxwell*, 799 S.W.2d 882, 886 (Mo.App.1990). Three time periods are of importance under the particular language of the Bar Plan policies: the date of the act or omission; the date claim is made against the insured; and the date the insured reports the claim to the carrier.

■ The default decree was entered on May 6, 1991. There is no dispute that this is the date of the act or omission upon which Ms. Herbert's claim is made. There is also no dispute that the claim was not reported to the carrier until September 16, 1992. There is considerable argument by the parties as to when claim was first made against the firm by Ms. Herbert. This sequence of events

brings, at least, the 1991/1992 policy and the 1992/1993 policy into play.[2]

The language of the policies provide coverage for:

CLAIMS FIRST MADE AGAINST AN INSURED DURING THE POLICY PERIOD AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD: ... PROVIDED ALWAYS THAT such act or omission happens ... during the Policy Period, or ... prior to the Policy Period, provided that prior to the effective date of this policy: ... An insured had no basis to believe that the Insureds had committed such an act or omission.

Ms. Herbert's claim does not fit within this coverage language for the 1991/1992 policy. The claim was not reported to the Bar Plan during the July 30, 1991 through July 30, 1992 policy period. The firm does not appear to argue that the 1991/1992 policy, or any previous policy, would provide coverage.

Unfortunately, Ms. Herbert's claim also does not fit within the coverage language for the 1992/1993 policy. While a formal demand for payment was not made against the law firm until Paul Passanante's letter dated September 14, 1992, the firm certainly did have knowledge of the default decree and Ms. Herbert's two letters of complaint and her claims of loss. For instance, in her June 13,1991, letter, Ms. Herbert informed Mr. Rosenblum that, "Your negligence, not only hurt me financially, but this is the biggest insult I have ever got" and "I have not received what is mine, because of your professional negligence" and "I have been going through an emotional distress because of all of this". In her January 13, 1992, letter, Ms. Herbert further recounted a discussion she had with Mr. Rosenblum stating, "And when I asked you if that is not going to work, what then? You said that I would have to file suit against you."

Within this context, the policy defines "claim" as "a demand for money or services". The policy does not define the term "first made" and whatever extra meaning "first made" gives to the term "claim". We need not wrestle with this issue, however, because even if we were to find that Ms. Herbert's various complaints did not constitute a "claim first made" against the law firm until the 1992/1993 policy period, the coverage language of the policy contains another requirement for acts occurring prior to the policy period.

█ The policy requires that "an insured had no basis to believe that the Insured had committed such an act or omission." This requirement contains the latent implication that the insured must have reason to know that the act or omission would be one that could give rise to a claim. *General Accident Insurance Co. of America v. Trefts*, 657 F.Supp. 164, 166 (E.D.Mo.1987). This implication is recognized in the Bar Plan policy by the incorporation of a "Discovery Clause" that provides coverage for acts or omissions that occurred prior to the policy period if the insured "first becomes aware of a specific act or omission" during the policy period.

Here, the firm knew that a default decree had been entered against Ms. Herbert prior to the 1992/1993 policy period. Ms. Herbert's two letters also established a basis for the firm to believe that a claim might arise out of the default divorce decree. Because the law firm knew prior to the 1992/1993 policy period that an act or omission had occurred and because the firm had been informed by Ms. Herbert that she might pursue a claim regarding that event, the 1992/1993 policy provides no coverage.

## IV.

Nonetheless, the law firm makes three arguments why coverage should exist. For the most part, these arguments simply reflect a

**2.** The language of both policies appears to be the same with the exception that the 1991/1992 policy is assessable and the 1992/1993 policy is not. The parties have not argued whether this would make a difference and we have not considered this issue.

Arguably, mere notice of the entry of a default decree against a client the firm was retained to represent in a particular matter would constitute a "basis to believe that the insured committed such an act or omission." This would result in the 1990/1991 policy period being the policy that should have been applicable. Neither party has discussed the applicability of this policy, so we disregard it as well.

misunderstanding of the language of the Bar Plan policies and the nature of claims made coverage.

First, the firm asserts that it did not believe that Ms. Herbert would actually assert a malpractice claim until the September 14, 1992 letter from Paul Passanante. The law firm supports this claim primarily with the testimony of Mr. Rosenblum that, for a number of reasons, he believed that this matter would be worked out and that Ms. Herbert would never file a claim.

The law firm simply misreads the language of the policy. The coverage requirement for acts or omissions that occurred prior to the policy period is not the subjective belief of the insured whether a claim will be made. Instead, under "The Coverage" section, the requirement is whether the "Insured had no basis to believe that the Insured had committed such an act or omission". Under the "Discovery Clause", the operative language is if the "Insured first becomes aware of a specific act or omission".

Regardless of the subjective belief of the lawyers involved, the entry of the default decree combined with Ms. Herbert's letters of complaint was sufficient to establish a "basis to believe that the insured committed such an act or omission". This is especially so because of Ms. Herbert's letters demanding that the law firm remedy her situation.

Second, the law firm argues that the failure to report this claim to the Bar Plan was not material because had the claim been timely reported it would not have caused a non-renewal or a premium increase. The law firm bases its argument upon the testimony of Mark Berry, the Bar Plan's vice president of claims. Mr. Berry stated that had the claim been properly reported the Bar Plan still would have issued the 1992/1993 policy to the firm for the same premium.

The questions of whether the policy would have been renewed or whether the premium for the renewed policy would have increased, however, are simply irrelevant. They do not bear upon any policy defense or issue of coverage. The firm was aware of facts that might give rise to a claim prior to the 1992/1993 policy period. Had the claim been reported in one of the prior policy periods, coverage would have existed. But, it was not. Regardless of whether a renewal policy was issued for the 1992/1993 policy period, or the price of that policy, the Herbert claim would not have been covered by that policy. The 1992/1993 policy simply provides no coverage for an act that occurred prior to the 1992/1993 policy period, regardless of whether it had been reported and was covered by a previous policy.

Finally, the law firm argues that the failure to report this claim to the Bar Plan did not result in prejudice to the insurer, so coverage should exist. The Bar Plan is not asserting a late notice defense under an occurrence policy. *See, Weaver v. State Farm Mutual Automobile Insurance Co.*, 936 S.W.2d 818 (Mo. banc 1997). Instead, it is arguing that coverage does not exist under any policy prior to the 1992/1993 policy because the claim was not reported to the Bar Plan within any of those policy periods. It also argues that coverage does not exist under the 1992/1993 policy because the default decree that the claim is based on occurred prior to the 1992/1993 policy period and the insured had a basis to know that a claim might arise from it.

The prejudice requirement is generally not held to apply to claims made policies:

> This is because, unlike an occurrence policy in which coverage is triggered by the occurrence of a negligent act or omission during the coverage period, a claims made policy provides coverage when the act or omission is discovered and brought to the attention of the insurer, regardless of when the act or omission occurred. Because the reporting requirement helps define the scope of coverage under a claims made policy, to excuse a delay in notice beyond the policy period would alter a basic term of the insurance contract. (Citation omitted.)

*Insurance Placements, Inc. v. Utica Mutual Insurance Co.*, 917 S.W.2d 592, 597 (Mo.App. 1996). *See also Continental Casualty Co. v. Maxwell*, 799 S.W.2d 882, 887 (Mo.App.1990); *Lexington Insurance Co. v. St. Louis University* 88 F.3d 632 (8 th Cir.1996). We see

no reason in the facts of this case to question this generally accepted principle of law, especially where there also appears ample evidence of prejudice. The Bar plan was denied the opportunity to manage and attempt to reach an early and relatively inexpensive resolution of Ms. Herbert's claim. A claim that obviously soured over time.

The judgement of the circuit court is affirmed.

All concur.