# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 07-3156

———————

H&R Block, Inc.,

    Plaintiff - Appellant,

v.

American International Specialty
Lines Insurance Company; Lexington
Insurance Company,

    Defendants - Appellees.

Appeal from the United States
District Court for the
Western District of Missouri.

———————

Submitted: May 14, 2008
Filed: November 14, 2008

———————

Before LOKEN, Chief Judge, BEAM and BYE, Circuit Judges.

———————

LOKEN, Chief Judge.

This diversity action raises an insurance coverage issue of first impression: whether class actions filed against nationwide tax preparer H&R Block ("Block") asserting a variety of statutory and common law claims arising out of Block's Refund Anticipation Loan ("RAL") program are excluded from "prior acts" coverage under professional liability "claims made" insurance policies because other class actions

asserting similar claims were filed prior to the policy periods. The district court[1] granted summary judgment to the insurers, American International Specialty Lines Insurance Co. ("AISLIC") and Lexington Insurance Co. ("Lexington"). Block appeals. Under Missouri law, which governs this dispute, "[t]he rules of contract construction govern insurance policies." Blair v. Perry County Mut. Ins. Co., 118 S.W.3d 605, 606 (Mo. banc 2003). Reviewing the court's interpretation of the policies and its grant of summary judgment *de novo,* we affirm. Todd v. Mo. United Sch. Ins. Council, 223 S.W.3d 156, 160 (Mo. banc 2007) (standard of review).

## I. Background

When the Internal Revenue Service encouraged the electronic filing of federal income tax returns in the late 1980's, Block developed and offered to its clients an electronic filing service, Rapid Refund, and soon added the RAL program for clients who did not want to wait for their refund checks. RALs are short-term loans processed by Block, funded by third-party banks, and repaid with the borrower's refund proceeds. Block processed more than 15,000,000 RALs from 1993-1996. Not surprisingly, this marketing success spawned a flurry of consumer class action lawsuits in state and federal courts, resulting in this coverage dispute.

**Block's Professional Liability Coverages.** During the years in question, Block and its affiliates obtained $1,000,000 in annual primary professional liability insurance coverage from affiliated insurers under four identical claims made policies that were "fronted" by Block, meaning that Block and its affiliates administered claims, paid amounts due under the policies, and reinsured the primary insurers for

---

[1]The HONORABLE SCOTT O. WRIGHT, United States District Judge for the Western District of Missouri. On the question we consider on appeal, Judge Wright followed the earlier ruling of the HONORABLE ORTRIE D. SMITH, United States District Judge for the Western District of Missouri, who later recused from the case when he inherited stock in one of the parties.

their entire $1,000,000 exposure. The policies also required Block to pay a "Self-Insured Retention" of $2,500 per wrongful act, a provision that generated sharp dispute in the district court but is not an issue we need consider on appeal.

On top of this primary coverage, Block purchased excess professional liability coverage. Evanston Insurance Company provided $2,000,000 in annual excess coverage from August 1992 to August 1998. In May 1996, Block purchased the two additional layers of excess coverage here at issue. Between May 1996 and August 1997, AISLIC provided $2,000,000 of second-layer excess coverage, and Lexington provided $5,000,000 of third-layer excess coverage. Between August 1997 and August 1998, AISLIC provided both the second- and third-layer excess coverages, again with a $7,000,000 total limit. The excess policies "followed form," meaning that the coverages and exclusions were the same as those in the primary policies.[2]

The primary and excess policies were "claims made" policies. They covered "errors, omissions or negligent acts" (referred to as "wrongful acts") committed in the conduct of Block's "Specified Operations," which were defined as "[t]he performance of tax services, including, but not limited to . . . processing applications for refund anticipation loans." The policies' basic coverage was for "claims first made . . . while this Policy is in effect . . . based on a wrongful act that occurred while this Policy was in effect," provided Block notified the primary insurer of the claim "while this Policy is in effect." By contrast, "occurrence" policies "generally provide coverage for an event that occurs during the policy period, regardless of when a claim is asserted." Wittner, Poger, Rosenblum & Spewak, P.C. v. Bar Plan Mut. Ins. Co., 969 S.W.2d 749, 752 (Mo. banc 1998).

---

[2] "Use of a follow form clause is advantageous . . . because it . . . . allows an insured to have coverage for the same set of potential losses (and with the same set of exceptions) in each layer of the insurance program." Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, 871 N.E.2d 418, 426 (Mass. 2007).

Relevant to this appeal are two provisions that extended this basic coverage to include "Prior Acts" -- claims based on a wrongful act that occurred before the policy's effective date, provided that Block "had no knowledge of the prior wrongful act on the effective date of this Policy, nor any reasonable way to foresee that a claim might be brought," and "Reported Acts" -- claims first made after the policy period ended provided Block "has reasonable knowledge that a wrongful act occurred and a claim might be made," and reported "[t]he suspected wrongful act" and "what loss or damage may result" during the policy period.

**The Class Action Litigation.** The first class action complaint on behalf of RAL program clients was filed in 1990. When Block purchased second- and third-layer excess coverages from AISLIC and Lexington in May 1996, eleven class action lawsuits had been filed in various state and federal courts across the nation, asserting a variety of statutory and common law damage claims based on allegations that Block failed to adequately disclose finance charges, charged usurious and unconscionable interest rates, failed to disclose it received "kickbacks" from the lending banks, misled clients as to the nature of the RAL loans, and breached a fiduciary duty to its clients by peddling imprudent, high-interest loans. One recent case was a nationwide class action filed in the Western District of Missouri in November 1995 asserting causes of action under the federal Truth in Lending Act, state statutes prohibiting unfair or deceptive acts and practices, state usury statutes, and common law fraud and negligent misrepresentation. No class had been certified, two complaints had been dismissed with prejudice, one case settled for $20,000, another settled for $150,000, and the rest were still pending. Block disclosed all this litigation to AISLIC and Lexington before they issued excess professional liability policies in May 1996.

Eleven more class actions were filed in federal and state courts between May 1996 and August 1998, when the AISLIC and Lexington excess policies were in effect. The fact allegations and legal theories in these suits mirrored those of the prior suits. By far the most significant was a state-wide class action filed in a Texas state

-4-

court in August 1996. More than six years later, when the trial judge certified a class and ruled that Block had intentionally violated a fiduciary duty to all class members, Block settled the case by giving each participating class member discount coupons on future Block services and paying $49,900,000 to plaintiffs' attorneys. Other class action cases filed during the policy periods settled for $19.5 million, $881,000, $550,000, $265,000, $22,700, and $250.

**Procedural History.** Block's primary insurers -- who had no financial stake in the issue -- agreed with Block that the class action lawsuits filed between May 1996 and August 1998 were covered by the primary policies. Block received $1,000,000 in primary policy proceeds for each annual policy period. Applying the same coverage provisions in the primary policies, the excess liability insurers -- Evanston, AISLIC, and Lexington -- denied additional coverage on multiple grounds. Block then commenced this diversity action seeking a declaratory judgment that the insurers must defend and indemnify Block up to the excess policies' limits for RAL suits filed during the applicable policy periods. After two years of discovery, the parties filed cross motions for summary judgment on various issues.

Applying the Prior Acts coverage provision, the district court ruled in an interlocutory order that the AISLIC and Lexington excess policies provided no coverage for RAL class action claims based on wrongful acts committed before the effective date of the policies because in May 1996, when the first two policies began, at least four class action complaints had been filed. The court explained:

> The Primary Policies . . . provided coverage for claims based on wrongful acts occurring before the effective date of the policy if [Block] both (1) lacked knowledge of the wrongful action and (2) lacked a "reasonable way to foresee that a claim might be brought." The clause does not require [Block] to know the identity of the person(s) presenting the claim. On this record [Block] had reason to know that additional claims would be filed by *somebody* when it obtained coverage.

-5-

The court did not apply this reasoning to Block's claims against Evanston because it began providing excess liability coverage in 1992. The court also ruled that the excess insurers have no duty to defend, only to reimburse Block for costs incurred in defending covered claims, subject to the policy limits (an issue Block concedes). The court did not issue a final judgment, commenting "the parties have more work to do." After Evanston and Block entered into a separate settlement, AISLIC and Lexington renewed their summary judgment motions, which the district court granted on the basis of its prior construction of the Prior Acts provision. This appeal followed.

## II. Discussion

The claims made policies provided coverage for Prior Acts if Block "had no knowledge of the prior wrongful act on the effective date of this Policy, nor any reasonable way to foresee that a claim might be brought." Block argues that this provision should be construed to provide coverage for prior acts unless Block could reasonably foresee "a specific claimant making a claim based on a specific alleged wrongful act known to Block before the inception of the policy." Applying this standard, Block asserts that all class action lawsuits filed during the policy periods fall within the Prior Acts coverages because it did not know before May 1996 "(a) the identity of the plaintiffs in those cases, (b) the specific 'wrongful acts' upon which those plaintiffs based their claims, (c) which tax season was involved, or (d) at which facility or in which jurisdiction the alleged wrongdoing took place." AISLIC and Lexington argue that the RAL lawsuits filed before May 1996 alleged the same facts and legal theories and therefore gave Block both knowledge of the wrongful acts and a reasonable basis to foresee that additional class action claims might be brought.

In most cases that have considered this issue under the prior acts provisions of claims made policies, the insured knew during the prior policy period that specific individuals considered themselves wronged; the question was whether the insured had reasonable notice that a claim based on those grievances would later be asserted. In

-6-

Wittner, Poger, for example, the court held that a law firm had reasonable notice of a likely claim when a client wrote letters complaining that the firm's negligence caused financial injury when a case was dismissed. The client's claim was *not* covered under a subsequent claims made policy, the court explained, because this prior knowledge gave the firm "a basis . . . to believe that a claim might arise." 969 S.W.2d at 753. Likewise, in City of Brentwood v. Northland Ins. Co., 397 F. Supp. 2d 1143, 1148 (E.D. Mo. 2005), the court held that an insured had a basis to believe its prior act could give rise to a claim when an employee's charge of discrimination was pending before federal and state employment discrimination agencies at the inception of the policy period. By contrast, in Fremont Indem. Co. v. Lawton-Byrne-Bruner Ins. Agency Co., 701 S.W.2d 737, 742-43 (Mo. App. 1985), the court held there was prior acts coverage because a client's prior letter to a regulatory agency requesting an investigation did not give the insured reasonable notice of a likely claim when all facts known at the policy's inception indicated that the matters raised in the letter "were resolved."

A more unusual case -- one on which Block relies -- was Redeemer Covenant Church of Brooklyn Park v. Church Mut. Ins. Co., 567 N.W.2d 71 (Minn. App. 1997). Before the claims made policy's inception, the insured church was sued by seven members who alleged sexual abuse by a former pastor. During the policy period, eight more lawsuits alleging similar abuse were filed. The court held that these later claims were covered prior acts because, at the policy's inception -

> [n]o claims had been filed for 15 months, and none of the [later] claimants had indicated any intent to file a claim. While [the church] was aware of [the pastor's] abuse and that the abuse had led to lawsuits, it had no knowledge that any 1991 claimant proposed to sue [the church] for having negligently hired or supervised [the pastor].

Id. at 78. The principle reflected in this decision is surely sound, for the very purpose of insurance is to protect against the risk of unknown but not unexpected loss. For

-7-

example, a claim that a Block agent negligently prepared a client's tax return would qualify for Prior Acts coverage even though Block had been sued for the same type of negligence by other clients prior to the policy's inception. Cf. Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, 871 N.E.2d 418, 430 (Mass. 2007). The difficult question in this case is how to apply this principle to class actions. The parties do not cite, and we have not found, any case considering whether one or more pre-policy class action claims preclude prior acts coverage of similar class action claims first asserted during the policy period.

The Prior Acts provisions covered "claims based on a wrongful act that occurred before the effective date of the Policy," provided that Block "had no knowledge of the prior wrongful act on the effective date of this Policy, nor any reasonable way to foresee that a claim might be brought." The policies defined "wrongful acts" as "errors, omissions or negligent acts" that cause a "loss" for which Block is "legally required to pay." Block portrays the uncertified, pre-policy class actions as simply individual lawsuits by the named plaintiffs seeking damages for specific wrongful act(s) done to them. But this ignores the realities of the modern consumer class action. To be sure, a named plaintiff lacks standing to represent a purported class unless he or she became a member of the class, here, by entering into a separate RAL transaction with Block and a lending bank. But to be certified, the purported class must satisfy the court that "there are questions of law or fact common to the class" that "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(a)(2), (b)(3). In other words, class action plaintiffs must allege and undertake to prove that each class member was injured by the same wrongful act or acts.

When a product or service has been sold nationwide, like the RAL program, even if the prior class action was limited to clients in a particular jurisdiction, claims based on uniform aspects of the RAL program and on causes of action recognized in most or all jurisdictions (such as violations of federal statutes or allegations of common law fraud, breach of contract, or breach of fiduciary duty) put Block on

reasonable notice that other contemporaneous clients will assert the same claims alleging that the same "wrongful acts" infected their individual transactions. Indeed, in this case, the nation-wide class action filed in the Western District of Missouri in November 1995 put Block on notice that, if the class was certified, every RAL client who did not opt out had already asserted claims for the wrongful acts alleged.

Block asserts that construing the Prior Acts provision in this manner renders the coverage "illusory." We disagree. Even a claims made policy with *no* prior acts coverage is not illusory, that is, "hopelessly or deceptively one-sided," "if the insurance premium were correspondingly small." Truck Ins. Exch. v. Ashland Oil, Inc., 951 F.2d 787, 790 (7th Cir. 1992). Here, the policies provided limited Prior Acts coverages. "The doctrine of illusory coverage applies only when part of the premium is specifically allocated to a particular type or period of coverage and that coverage turns out to be functionally nonexistent." United Fire & Cas. Co. v. Fid. Title Ins. Co., 258 F.3d 714, 719 (8th Cir. 2001) (internal quotation omitted). There has been no such showing in this case.

Block further argues that AISLIC and Lexington created an unconscionable gap in coverage by denying Prior Acts coverage for claims for which Block could not have obtained Reported Acts coverage in an earlier policy period. This argument has more force. By limiting coverage to claims made and reported during the policy term, a claims made policy "allows the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty." F.D.I.C. v. St. Paul Fire & Marine Ins. Co., 993 F.2d 155, 158 (8th Cir. 1993); see Lexington Ins. Co. v. St. Louis Univ., 88 F.3d 632, 634 (8th Cir. 1996). Liability policies are typically written for one-year periods, and the delay between the occurrence of a wrongful act and the assertion of a claim arising out of that act may be considerable. By offering Prior Acts and Reported Acts coverages, the claims made insurer enables the insured to maintain continuous liability coverage through a succession of one-year policies, even if it changes insurers. That benefit should be real, not imaginary.

For this reason, we agree with Block that the Prior Acts and Reported Acts policy provisions should be read together, perhaps even *in pari materia*. Thus, when a series of claims made policies contains these provisions, prior knowledge should not preclude Prior Acts coverage under the policy in effect when a claim is asserted if that knowledge, timely reported, would have been insufficient to obtain Reported Acts coverage under the policy in effect when the wrongful act occurred. But the insured must report the claim during the proper policy period. It may not transfer Reported Acts coverage to subsequent policies with larger policy limits by failing to report the wrongful acts until the subsequent policies are in effect and then claiming Prior Acts coverage under those policies. See Wittner, Poger, 969 S.W.2d at 754.

In this case, Block simply asserts, without analysis or citation to authority, that the Reported Acts coverage under the policies "requires substantially more (unavailable) knowledge and concreteness than the district court said was sufficient to bar prior-acts coverage." We reject as unproved the contention that Block could not have invoked the Reported Acts provisions of its prior excess policy with Evanston by reporting that the claims asserted in the nation-wide class action filed in the Western District of Missouri were reasonably likely to result in the future assertion of the same wrongful acts by other clients. Instead of submitting such a report, Block purchased two additional layers of excess liability coverage in May 1996 -- before the expiration of Evanston's first-layer policy on August 20, 1996 -- and claimed coverage of the additional class actions predictably filed between May 1996 and August 1998 only under the Prior Acts provisions of its excess policies. We note that Reported Acts coverage would have required reporting "what loss or damage may result" if such future claims were to be asserted. In this case, the potential losses or damages would have been difficult to forecast, and Evanston might well have denied Reported Acts coverage for that and other reasons. But if Block had filed claims under the Reported Acts provision of the prior policy, as well as claims under the Prior Acts provisions of the excess policies here at issue, its assertion of an unconscionable gap in coverage if the excess insurers denied *all* coverage would be far more persuasive.

On this record, we agree with the district court that the class action lawsuits filed on behalf of RAL program clients prior to the inception of the excess liability policies here at issue gave Block both knowledge of the prior wrongful acts on which later class action claims were based and a reasonable way to foresee that such future claims might be brought. Cf. Int'l Surplus Lines Ins. Co. v. Mfrs. & Merchs. Mut. Ins. Co., 661 A.2d 1192, 1193-95 (N.H. 1995).[3] Accordingly, prior acts coverage was properly denied.

The judgment of the district court is affirmed.

_____

_____

[3]Given this conclusion, we need not consider an issue extensively debated by the parties on appeal, whether the "nor" joining the two conditions limiting Prior Acts coverage should be read in the disjunctive, as Block reads it, or in the conjunctive, as Block contends the district court read it.