Lisa GRISSOM, Plaintiff–Respondent,

v.

FIRST NATIONAL INSURANCE AGENCY, et al., Defendants–Respondents,

v.

General Insurance Company of America, Garnishee–Appellant.

No. SD 31400.

Missouri Court of Appeals, Southern District, Division Two.

May 16, 2012.

Motion for Rehearing and Transfer Denied June 5, 2012.

Application for Transfer Denied Aug. 14, 2012.

See also 364 S.W.3d 728.

T. Michael Ward, St. Louis, MO, for Appellant.

James E. Spain, Poplar Bluff, MO, for Defendants.

John P. Clubb, Cape Girardeau, MO, for Respondent.

JEFFREY W. BATES, Judge.

Lisa Grissom (Grissom) filed a garnishment action against General Insurance Company of America (GICA) seeking to satisfy a judgment entered on Grissom's Missouri Human Rights Act (MHRA) claim (hereinafter referred to as the un-

derlying judgment) from a GICA insurance policy. Both parties moved for summary judgment, and the trial court entered judgment in Grissom's favor. None of the material facts are in dispute. Because Grissom is not entitled to judgment as a matter of law, we reverse and remand with directions for the trial court to enter judgment in favor of GICA.

## I. Factual and Procedural Background

Grissom filed this garnishment action to satisfy the underlying judgment entered against Loy Welker (Welker) under a GICA insurance policy issued to Tri–Star of Sikeston, Inc. (Tri–Star), a business selling commercial and residential insurance products.[1] Welker was the owner and president of Tri–Star from January 2005 to January 2008.

In 2006 and 2007, GICA issued an annual claims-made "Insurance Professionals Errors and Omissions" liability insurance policy to Tri–Star as the named insured. Officers of Tri–Star, like Welker, were additional insureds under the policy. Each policy covered claims made during the one-year policy period that commenced on January 6th. Each year's policy covered a claim made during the annual policy period and reported either during the policy year or up to 60 days after the policy period expired on January 6th. If a claim was not properly reported during the policy year or within 60 days thereafter, the claim was not covered. Hereinafter, the 2006–07 and 2007–08 policies are referred to as Policy A and Policy B, respectively.[2]

In January 2005, Grissom was hired to work at Tri–Star. In July 2005, Grissom hand delivered a letter from her attorney to Welker accusing him of "perpetual and continual sexual harassment" that Grissom endured by Welker's "comments and physical contact during the past year." The letter further stated that Grissom documented Welker's harassment "for future use with potential litigation" and that Welker's actions had caused Grissom "great emotional and physical injury." Grissom stated that, if the harassment did not stop, she would file a claim with the Equal Employment Opportunity Commission (EEOC) and sue Welker.

In January 2006, Welker fired Grissom. Thereafter, Grissom filed a complaint against Welker with the Missouri Commission on Human Rights (MCHR), accusing Welker of wrongful discharge and retaliation due to her prior accusations of sexual harassment. In May 2006, Welker received a "letter of complaint" (complaint) from the MCHR notifying him of Grissom's claims.

In July 2006, Grissom filed a "Charge of Discrimination" (charge) against Welker with the MCHR and the EEOC, again asserting that Welker sexually harassed and retaliated against Grissom. Each charge stated that she sought "compensatory damages, including compensation for pain, humiliation and suffering, and whatever else the Commission deems just and proper." In August 2006, Welker received notices from both the MCHR and the EEOC of Grissom's charge. In October or November 2006, Welker asked Grissom to meet with him to discuss settlement of her claims. Grissom did not meet with Welker at that time.

In November 2006, Welker filled out an application to renew Policy A for the following year. In the "Loss History" sec-

---

1. At all times relevant herein, Tri–Star was doing business under the fictitious name of First National Insurance Agency.

2. Policy B was a renewal of Policy A. The terms of both policies were the same, except for the premiums charged.

tion, the application asked Welker if he had any employment-related claims:

9. Regardless of whether or not such may have been covered by any insurance policy, have you had or do you presently have any employment-related claims including, but not limited to, complaints, charges, grievances, arbitrations, litigation, administrative agency proceedings (federal, state, or local), or negotiated settlements ("claims") concerning employment issues such as hiring, promotion, termination, discrimination, or sexual harassment? If yes, please provide information on the Supplemental Application—Claims for each such "claim" in the past five years. ___ Yes X No

10. After diligent inquiry, does the applicant or any of its predecessors in business, subsidiaries, affiliates, past or present partners, owners, salespersons, employees, or independent contractors have knowledge of any facts, incidents, internal complaints, or circumstances ("incidents") which may result in employment-related claims being made against you? If yes, please provide information on the Supplemental Application–Claims for each such "incident." ___ Yes X No

As indicated above, Welker answered "No" to both questions and did not report Grissom's complaint or the charges Welker had received from the MCHR and EEOC. The application further warned:

**Any employment-related claims, or claims that may arise from facts, incidents, or circumstances that you have disclosed, or should have disclosed in response to questions 9 and 10, will be excluded from coverage under the insurance for which this Application is made.**

(Bold emphasis in original.)

On January 22, 2007, the MCHR issued two "Notice of Right to Sue" letters to Grissom for her prior complaints filed in 2006. The MCHR sent copies of both letters to Welker. In February 2007, the EEOC issued a "Notice of Right to Sue" letter to Grissom, and also sent a copy of the notice to Welker. On April 13, 2007, Grissom filed suit against Welker for, *inter alia*, wrongful discharge and retaliation (the MHRA claims).

On April 24, 2007, Welker first notified GICA of Grissom's claims. Welker sought coverage for defense and indemnity of Grissom's claims under Policy B, which had a policy period of January 6, 2007 through January 6, 2008. Following an investigation, GICA denied coverage because Grissom first asserted her claims against Welker in 2006 before Policy B's inception, and Welker failed to report the claims to GICA. GICA also denied coverage under Policy A because Welker received notice of Grissom's complaint and charge against him from the MCHR and EEOC during the 2006–07 policy period and failed to report the claim by March 7, 2007, which was 60 days after Policy A's expiration.

On August 10, 2010, following a jury trial, the trial court entered the underlying judgment in favor of Grissom and against Welker on the MHRA claims. Grissom was awarded $25,000 in actual damages, $100,000 in punitive damages, $84,007.50 in attorney's fees and $5,500.41 in court costs.

On August 19, 2010, Grissom filed this action to garnish Policy B to satisfy the underlying judgment. Grissom and GICA each filed motions for summary judgment. The undisputed facts supporting each motion were supplemented, following additional discovery, at the trial court's direction.

After hearing argument on the matter, the trial court granted Grissom's motion

for summary judgment and denied GICA's cross-motion. The court's judgment stated that the 2006 MCHR and EEOC notices did not constitute a "claim" that Welker was required to report according to the provisions of Policy B. The trial court reasoned that the policy definition of "claim" required findings to have been made. The court also reasoned that no claim existed until Grissom obtained her right-to-sue letters from the MCHR and EEOC in January and February 2007, which permitted her to file her civil lawsuit in April 2007. The court concluded that the policy language defining a "claim" was not ambiguous and that a "lawsuit is a claim." The court therefore ordered GICA to pay Grissom the full amount of the garnishment, $217,673.63, plus $5,000 for attorney's fees authorized under § 213.111. This appeal followed. Additional facts will be provided as necessary to address GICA's single point on appeal.

## II. Standard of Review

Summary judgment is appropriate where no genuine issues of material fact exist and the movant·is entitled to judgment as a matter of law. *ITT Commercial Fin. Corp. v. Mid–Am Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993); Rule 74.04(c)(6).[3] "The key to summary judgment is the undisputed right to judgment as a matter of law; not simply the absence of a fact question." *ITT*, 854 S.W.2d at 380. Appellate review is *de novo*. *Id.* at 376. Consequently, this Court does not defer to the trial court's decision to grant summary judgment. *Barekman v. City of Republic*, 232 S.W.3d 675, 677 (Mo.App.2007). Instead, we use the same criteria the trial court should have employed in initially deciding whether to grant the motion. *Id.*, *ITT*, 854 S.W.2d at 376. "A 'claimant' must establish that there is no genuine dispute as to those material facts upon which the 'claimant' would have had the burden of persuasion at trial." *ITT*, 854 S.W.2d at 381. For Grissom to prevail on her garnishment claim, she had to prove that Policy B provided coverage for the underlying judgment. *See Inman v. St. Paul Fire & Marine Ins. Co.*, 347 S.W.3d 569, 579 (Mo. App.2011); *Wilson v. Traders Ins. Co.*, 98 S.W.3d 608, 612 (Mo.App.2003).

## III. Discussion and Decision

In GICA's point, it contends the trial court erred by granting Grissom's motion for summary judgment and denying GICA's cross-motion for summary judgment because Policy B provides no coverage for the underlying judgment. GICA argues that Welker failed to comply with the claim-reporting requirements in Policy B.

 The interpretation of an insurance policy is an issue of law that we review *de novo*. *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. banc 2010). In construing the terms of an insurance policy, "this Court applies the meaning which would be attached by an ordinary person of average understanding if purchasing insurance, and resolves ambiguities in favor of the insured." *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007); *Burns*, 303 S.W.3d at 509. We read the policy as a whole to determine the parties' intent and give the policy language used its plain and ordinary meaning. *Thiemann v. Columbia Pub. Sch. Dist.*, 338 S.W.3d 835, 839–40 (Mo.App.2011). If, giving the language used its plain and ordinary meaning, the intent of the parties

---

**3.** All references to rules are to Missouri Court Rules (2011). All references to statutes are to RSMo (2000).

is clear and unambiguous, this Court cannot resort to rules of construction to interpret the contract. *Id.* "If the policy is unambiguous, the policy will be enforced according to its terms." *Merlyn Vandervort Investments, LLC v. Essex Ins. Co., Inc.,* 309 S.W.3d 333, 336 (Mo.App.2010); *Seeck,* 212 S.W.3d at 132. An unreasonable alternative construction of a term will not render a policy ambiguous, nor will simple disagreement over the interpretation of the contract's terms. *See Gavan v. Bituminous Cas. Corp.,* 242 S.W.3d 718, 720 (Mo. banc 2008); *Thiemann,* 338 S.W.3d at 840; *Selimanovic v. Finney,* 337 S.W.3d 30, 35 (Mo.App.2011). An ambiguity exists only when a policy term is reasonably open to different constructions. *Gavan,* 242 S.W.3d at 720.

■ Generally, "under a 'claims made' policy, coverage is triggered when the negligent act or omission is *discovered and reported to* the insurer during the applicable policy period, regardless of when the act or omission occurred." *Landry v. Intermed Ins. Co.,* 292 S.W.3d 352, 356 (Mo. App.2009) (emphasis in original); *see also Wittner, Poger, Rosenblum & Spewak, P.C. v. Bar Plan Mut. Ins. Co.,* 969 S.W.2d 749, 752 (Mo. banc 1998) ("claims made policies generally are triggered by the date the claim is made upon the insured"). In *Landry,* the western district of this Court explained that a claims-made policy places special reliance on notice:

Notice must be given to the insurer during the policy period. If the insured does not give notice within the contractually required policy period, there is simply no coverage under a claims made policy, whether or not the insurer was prejudiced. This is because the event which invokes coverage in a claims made

policy is transmittal of notice of the claim to the insurer. "The very essence of a claims made policy is notice to the carrier within the policy period."

*Landry,* 292 S.W.3d at 356 (citations omitted); *see also Insurance Placements, Inc. v. Utica Mut. Ins. Co.,* 917 S.W.2d 592, 597 (Mo.App.1996) ("[b]ecause the reporting requirement helps define the scope of coverage under a claims made policy, to excuse a delay in notice beyond the policy period would alter a basic term of the insurance contract").[4] Policy B contains the following relevant provisions:

A. COVERAGE PROVISION

We will pay on behalf of the Insured **damages** in excess of the Deductible shown in the Schedule that the Insured becomes legally obligated to pay because of **claims** made against the Insured for **employment practices.**

B. CLAIMS–MADE PROVISION

This Insurance applies to an **employment practice** only if:

1. the **damages** result from **claims** made by **employees,** former **employees, leased workers, temporary workers** or applicants for employment by you;

2. the **employment practice** first took place on or after the **Retroactive Date;**

3. Prior to the inception date of this Coverage Part or the first such Coverage Part issued and continuously renewed by us, no Insured had knowledge of such **employment practice** and had no basis to reasonably anticipate a **claim** that would be made. For purposes of this provision, prior knowledge of an em-

---

4. The other type of professional liability policy is an "occurrence" policy, which provides "coverage for an event that occurs during the policy period, regardless of when a claim is asserted." *Wittner,* 969 S.W.2d at 752; *see also Landry,* 292 S.W.3d at 356.

**ployment practice** includes, but is not limited to, any prior **claim** or possible **claim** or circumstance referenced in an Insured's **application;**

4. a **claim** arising out of the **employment practice** is first made against any Insured during the **policy period,** and

5. the **claim** is reported in writing to us no later than 60 days after the end of the **policy period** or, if applicable, during an Extended Claims Reporting Period.

(Bold emphasis in original, indicating separately defined terms.)

Thus, to prove coverage under Policy B, Grissom had to establish that each of the above five conditions precedent were met. The parties do not dispute that the first two conditions have been met with respect to damages and the employment practice first taking place on or after the retroactive date of Policy B, which is January 6, 2005. The parties agree that the relevant employment practice giving rise to Grissom's claims is her firing in January 2006, which occurred well after the retroactive date.[5] The parties do not agree, however, that the latter three conditions precedent have been met. The fulfillment of those conditions turns on what constitutes a claim, as defined by the GICA policy, that Welker was required to report. Policy B contains the following definition of "claim":

"**Claim**" means written or oral notice presented by:

1. Any **employee,** former **employee, leased worker, temporary worker** or applicant for employment by you; or

2. The EEOC or any other federal, state or local administrative or regulatory agency on behalf of such person in item 1. above;

that the Insured is responsible for **damages** as a result of injury arising out of any **employment practice.**

**Claim** includes any civil proceeding in which either **damages** are alleged or fact-finding will take place, when either is the actual or alleged result of any **employment practice** to which this insurance applies. This includes:

. . .

3. any administrative proceedings established under applicable federal, state or local laws as may be applicable to **employment practices** covered under this insurance.

(Bold emphasis in original.)

██ GICA contends Policy B provides no coverage for the underlying judgment because Welker first received notice of Grissom's claim, as defined by the policy, before Policy B's inception. GICA argues that Welker knew he was alleged to have engaged in a prohibited employment practice, and he had reason to anticipate a claim would be made by Grissom, but he failed to disclose her claim in the application for Policy B. We agree.

A similar condition precedent was at issue in *Wittner, Poger, Rosenblum & Spewak, P.C. v. Bar Plan Mut. Ins. Co.,* 969 S.W.2d 749 (Mo. banc 1998). There, the insured received two letters from a claimant suggesting the insured committed malpractice before the relevant policy period. *Id.* at 750–51. The insured argued the claimant's letters did not constitute a

---

5. Policy B defined employment practices to mean "any of the following actual or alleged practices which are directed against any of your **employees,** former **employees** ... and for which remedy is sought under any federal, state or local statutory or common civil employment law: ... wrongful termination of employment, including retaliatory or constructive discharge...."

"claim" within the meaning of the policy because the claimant made no demand for damages. *Id.* at 753. Our Supreme Court, however, held it need not determine whether the letters actually constituted a "claim" as defined in the policy because the policy also specified a condition precedent that the insured have "no basis to believe that the Insured had committed such an act or omission" that could give rise to a claim. *Id.* Because the insured received notice of the insured's act that gave rise to the claim before the policy period began, the claims-made policy provided no coverage. *Id.*

Like the policy in *Wittner*, two policies at issue in *City of Brentwood, Mo. v. Northland Ins. Co.*, 397 F.Supp.2d 1143 (E.D.Mo.2005) contained a similar condition precedent that precluded coverage for claims in which the insured "had any knowledge of any circumstance likely to result in or give rise to a 'claim' nor could have reasonably foreseen that a 'claim' might be made." *Id.* at 1146. There, the insured knew about a former employee's charges of discrimination filed with the MCHR and the EEOC prior to the commencement of the relevant policy period. *Id.* at 1145. After the policy period began, however, the insured received notice of the employee's right-to-sue letters and suit was filed. *Id.* In determining whether coverage applied, the *Brentwood* court concluded that "[u]nder the plain language of the policies, the condition precedent was not met, because [the insured] could have reasonably foreseen that a claim might be made arising from those charges." The district court explained:

> As of July 1, 2001, [the insured] had received two letters informing it that [employee] had filed charges of discrimination with the MCHR and EEOC and that those government agencies were conducting investigations into the al-

leged acts of discrimination and retaliation. The letters included copies of [employee's] charges, which clearly outlined the acts that [employee] sought to challenge. Because the [employee's] claim was reasonably foreseeable at the inception of the policy, the condition precedent was not met and the claim was not covered under either policy.

*Id.* at 1147.

In *First Bancshares, Inc. v. St. Paul Mercury Ins. Co.*, 2011 WL 4352551, *2–3 (W.D.Mo. Sept.16, 2011), employee Dooms was fired by the bank in April 2007. That same month, Dooms filed an application for unemployment benefits which alleged that she had been wrongfully terminated for blowing the whistle about certain practices occurring at the bank. The bank's application for a claims-made policy with St. Paul did not mention Dooms' firing. St. Paul issued a liability policy insuring the bank against employment practices that included the wrongful discharge of an employee. The policy period ran from July 1, 2007 through July 1, 2010. Under the terms of the policy, however, coverage did not extend to any claim arising from any such fact, circumstance or situation to the extent the claim was against an insured who knew of such fact, circumstance or situation prior to the issuance of the proposed policy. *Id.* at *1–2. In October 2009, Dooms sued the bank for wrongful discharge, and St. Paul denied coverage. In the bank's declaratory judgment action, St. Paul sought summary judgment on the ground that, before the policy was issued, the bank had knowledge of facts about Dooms which could reasonably give rise to a claim. Applying *Wittner* and *Brentwood,* the *First Bancshares* court granted summary judgment to St. Paul. The district court concluded that, from an objective basis, the bank had knowledge of facts, circumstances or situation which

could reasonably give rise to a claim by Dooms. *Id.* at *2–3.

The condition precedent policy language in the foregoing cases is sufficiently similar to the provisions at issue here to guide our analysis. Welker received a notice of Grissom's complaint from the MCHR in May 2006 and her charges from the MCHR and EEOC in August 2006. Each charge specifically stated that Grissom sought "compensatory damages, including compensation for pain, humiliation and suffering, and whatever else the Commission deems just and proper." Welker understood that Grissom was asserting a claim for damages against him because he contacted Grissom in October or November 2006 in an attempt to settle her claims. Accordingly, the undisputed facts demonstrate that, prior to the inception of Policy B, Welker had knowledge of at least a "possible claim" and that Welker could reasonably anticipate that a claim would be made when he filled out the application for Policy B. *See, e.g., Wittner,* 969 S.W.2d at 753; *City of Brentwood, Mo. v. Northland Ins. Co.,* 397 F.Supp.2d 1143, 1147 (E.D.Mo.2005); *Ann Arbor Public Schools v. Diamond State Ins. Co.,* 236 Fed.Appx. 163, 168 (6th Cir. 2007) ("filing of EEOC and state administrative charges are well-recognized precursors to a lawsuit, irrespective of the outcome at the administrative level"; these investigations also put insured "on notice to reasonably expect a prospective state lawsuit"). We reject Grissom's argument that the policy language in the above-cited cases is too dissimilar to be relevant.

■ With respect to the policy definition of "claim," we agree with the trial court that the definitional language is not ambiguous. For the following reasons, however, we disagree with the trial court's legal conclusion that notice of the MCHR and EEOC proceedings in 2006 did not constitute a claim because neither commis-sion had entered findings, awarded damages or issued Grissom her right-to-sue letters. In *State ex rel. Diehl v. O'Malley,* 95 S.W.3d 82 (Mo. banc 2003), our Supreme Court described the process for a complainant alleging discrimination to seek redress:

> When [complainant] believed that she had been discriminated against, her first avenue of redress was to file an administrative complaint with the Missouri Commission on Human Rights, established in chapter 213, or with the federal Equal Opportunity Commission or with a local commission empowered to receive such complaints. When the state commission receives such a complaint, it is to investigate the complaint, attempt conciliation or otherwise to resolve the matter or, failing conciliation, to bring the matter before an administrative hearing. When the commission adjudicates a complaint through hearing, the decision can be appealed to a circuit court, under section 213.085, and judicial review is provided in accordance with chapter 536, which governs judicial review of administrative decisions. . . .

> Missouri Human Rights Act actions have a separate, alternate path available to a complainant. That path is set forth in section 213.111, which allows Diehl to opt out of the commission's proceedings by asking for [a] letter indicating that she has a right to bring a civil action (commonly referred to as a "right to sue" letter). When she requests the letter, after 180 days from the filing of her complaint with the commission, the commission is obligated to issue the letter if the commission has not completed its administrative processing. At this point, the complainant has the right to bring an action for damages or other relief against the respondent within 90 days of the letter, but not more than two

years after the discrimination allegedly took place, in the circuit court "in any county in which the unlawful discriminatory practice is alleged to have occurred...." Section 213.111.... *Id.* at 89–90. Proceedings before both the EEOC and the MCHR are "administrative proceedings" within the meaning of the policy. *See Brentwood,* 397 F.Supp.2d at 1147 ("charges filed with the MCHR and EEOC ... clearly constitute 'matters before local, state or federal boards.' The MCHR and EEOC are state and federal commissions, respectively"); *Am. Ctr. for Intern. Labor Solidarity v. Fed. Ins. Co.,* 518 F.Supp.2d 163, 169 (D.C.Cir.2007) ("EEOC proceedings are unambiguously 'administrative proceedings,'" within the meaning of an insurance policy).

The trial court's conclusion that notice of the administrative proceedings did not constitute a claim because neither the MCHR or EEOC had entered findings or awarded damages is incompatible with the plain language of the policy defining what a "claim" is. That definition specifically includes "administrative proceedings" in which "either damages *are alleged or* fact-finding *will take place*" (emphasis added), thereby expressly including proceedings in which an administrative agency has not yet awarded damages or conducted any fact-finding. Given this plain and unambiguous language, a reportable "claim" existed here when Welker received notice that administrative proceedings had been initiated by the MCHR and EEOC. We reject Grissom's assertion that a "claim" only exists when: (1) the administrative agency has awarded damages or issued a right-to-sue letter; or (2) a lawsuit has been filed. As in *Brentwood,* we conclude that "[w]hen read in context, there is simply no language that would lead a reasonable policy-holder to conclude that 'claim' ... only applies to lawsuits actually filed in court." *Brentwood,* 397 F.Supp.2d at 1147; *see,*

*e.g., Specialty Food Sys. Inc. v. Reliance Ins. Co. of Ill.,* 200 F.3d 816 (5th Cir.1999) (holding that "claim," as used in a claims-made policy, unambiguously included notice of an EEOC complaint, despite the insured's argument that claimant's subsequent lawsuit constituted the first claim); *Janjer Enters., Inc. v. Executive Risk Indemnity, Inc.,* 97 Fed.Appx. 410, 415–16 (4th Cir.2004) (holding insured failed to satisfy a "claims made and reporting" policy's condition precedent to coverage by failing to report a Notice of Charge of Discrimination from the EEOC to its insurer, even though insured promptly reported the claimant's later-filed lawsuit).

Reading the policy as a whole and giving the policy language its plain and ordinary meaning, as we must, we hold that the notices Welker received of the MCHR and EEOC proceedings constituted a claim which he was required to timely report. To hold otherwise would invalidate the policy's express language defining "claim" to include "administrative proceedings."

At oral argument, Grissom cited *City of Santa Rosa v. Twin City Fire Ins. Co.,* 140 N.M. 434, 143 P.3d 196 (N.M.Ct.App.2006), for the proposition that a charge filed with the EEOC and the New Mexico Human Right Division does not constitute a claim under an insurance policy. In that case, a "claim" was defined as "a demand received by any insured for damages alleging injury or damage to persons or property, including the institution of a suit for such damages against any insured." *Id.* at 199. The New Mexico Court of Appeals determined that the charge was not a demand for damages and therefore not a claim as defined in the policy. *Id.* at 199–200. The Court noted, however, this case was distinguishable from other cases "in which the policy definitions of a 'claim' included administrative proceedings because the poli-

cy in this case does not have such a definition." *Id.* at 201. Here, we have that very definition. Consequently, *City of Santa Rosa* does not aid Grissom.

■ Finally, we also reject Grissom's argument that Policy B provides coverage for a claim first reported after the retroactive date of January 6, 2005. Based on the plain and unambiguous language of the policy, the retroactive date applies only to "employment practices" and not to claims. In other words, Policy B provides coverage for *claims* first made during the annual policy period, arising out of *employment practices or acts* occurring on or after the earlier retroactive date. *See Continental Cas. Co. v. Maxwell,* 799 S.W.2d 882, 887 (Mo.App.1990) ("[i]n exchange for limiting coverage only to claims made during the policy period, the carrier provides the insured with retroactive coverage for errors and omissions that took place prior to the policy period"). Grissom's reliance on the retroactive date as a basis for coverage is, therefore, misplaced.

Because Grissom asserted her claim against Welker before Policy B's inception and Welker failed to timely report that claim, Grissom is unable to prove a condition precedent to coverage under Policy B. Consequently, the trial court erred in granting summary judgment to Grissom.

As noted above, GICA also contends the trial court erred in denying summary judgment to GICA. Ordinarily, the denial of a motion for summary judgment will not be reviewed on appeal. *See Brown v. Simmons,* 335 S.W.3d 481, 486 (Mo.App.2010). In the case at bar, however, the parties agree that the material facts are undisputed. The sole issue raised in both parties' motions for summary judgment is whether Policy B provided coverage for the underlying judgment. It is evident that the trial court's decision on the legal question of coverage is what prompted its ruling in favor of Grissom and against GICA. Because the material facts are undisputed and the merits of GICA's cross-motion are inextricably intertwined with the issues raised in Grissom's motion, we will reach the merits of the trial court's decision to deny summary judgment to GICA. *See Lero v. State Farm Fire and Cas. Co.,* 359 S.W.3d 74, 81–82 (Mo.App.2011); *Nodaway Valley Bank v. E.L. Crawford Constr., Inc.,* 126 S.W.3d 820, 824 (Mo. App.2004); *Lopez v. Am. Family Mut. Ins. Co.,* 96 S.W.3d 891, 892 (Mo.App. 2002). Because Policy B provides no coverage for the underlying judgment, the trial court's ruling was erroneous. Point I is granted.

The trial court's judgment is reversed. The cause is remanded with directions to enter judgment in favor of GICA.

SCOTT, J., and FRANCIS, P.J., Concurs.