# United States Court of Appeals
### For the Eighth Circuit

_____

No. 13-3381

_____

Philadelphia Consolidated Holding Corporation, doing business as Philadelphia
Insurance Companies

*Plaintiff - Appellee*

v.

LSI-Lowery Systems, Inc.

*Defendant*

Hodell-Natco Industries, Inc.

*Defendant - Appellant*

The Integrated Business Solutions Group, Inc.

*Defendant*

_____

No. 13-3397

_____

Philadelphia Consolidated Holding Corporation, doing business as Philadelphia
Insurance Companies

*Plaintiff - Appellee*

v.

LSI-Lowery Systems, Inc.

*Defendant - Appellant*

Hodell-Natco Industries, Inc.; The Integrated Business Solutions Group, Inc.

*Defendants*

————————

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

————————

Submitted: September 8, 2014
Filed: January 9, 2015

————————

Before RILEY, Chief Judge, SMITH and KELLY, Circuit Judges.

————————

KELLY, Circuit Judge.

LSi-Lowery Systems, Inc. (LSi), and Hodell-Natco Industries, Inc. (Hodell), appeal the district court's[1] grant of summary judgment in a declaratory action filed by Philadelphia Consolidated Holding Corporation, d/b/a Philadelphia Insurance Companies (PIC). PIC filed the action in the Eastern District of Missouri to determine whether PIC was required to defend and indemnify its insured, LSi, with respect to a lawsuit filed by Hodell in the Northern District of Ohio. The district court found LSi did not have coverage under either of its policies[2] with PIC because it did not provide notice of Hodell's claims or potential claims to PIC as required

---

[1]The Honorable Catherine D. Perry, Chief Judge, United States District Court for the Eastern District of Missouri.

[2]LSi had two consecutive policies with PIC.

under the policy. Hodell and LSi appeal.[3] Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

LSi is a firm that provides computer and technology consulting services. In December 2004, LSi sold business software[4] to Hodell. LSi also agreed to develop an add-on program for the software. As part of its implementation services, LSi evaluated Hodell's hardware and software requirements and performed testing. The software went live on March 1, 2007, and Hodell immediately began experiencing performance problems.

Most of the undisputed facts are documented in emails between Hodell and LSi. On March 13, 2007, Kevin Reidl of Hodell emailed Dan Lowery of LSi, complaining the system was unstable and slow, affecting Hodell's "bottom line each day at very real levels." He demanded "an around-the-clock effort by ALL parties involved to get our company back off of its knees." In a March 14, 2007, email, LSi acknowledged that, "if we do not get Hodell happy, we can expect a legal issue." On March 20, 2007, Hodell emailed LSi, "If we don't see immediate results on the system performance . . . I will recommend . . . that we start the process of taking legal action."

---

[3]Hodell filed its notice of appeal on October 29, 2013, and the case was docketed under case number 13-3381. LSi filed its notice of appeal on October 30, 2013, and it was docketed under case number 13-3397. The Integrated Business Solutions Group, Inc., is a wholly owned subsidiary of LSi and did not file a notice of appeal. The Hodell and LSi cases were consolidated on November 1, 2013.

[4]The business software was developed by another company that was not a party to the declaratory action.

On April 11, 2007, LSi emailed the business-software developer stating Hodell was "close to throwing the system out" and warning that "[i]f they throw the system out, they will for sure get legal with us all." On April 25, 2007, Hodell emailed LSi asking "who will pay for damages." That same day, Hodell emailed LSi that "our attorneys have now been brought into the loop."

On June 5, 2007, Hodell emailed LSi a list of tasks and stated if they were not completed, "we will be turning communications over to our legal advisors." Lowery of LSi responded the same day that Hodell's threats of "going to court" had left him "shaken" and that the problems had "hit [him] financially very hard as well." In a June 25, 2007, email, Hodell demanded LSi correct everything "or reimburse Hodell-Natco for the expense." On June 29, 2007, Hodell informed LSi it would "be receiving correspondence from our legal advisors." On July 6, 2007, an internal email at LSi acknowledged that, without "big performance improvements" on the Hodell project, LSi would "receive a letter from [Hodell's] lawyers . . . [p]robably stating their demands for money."

On July 24, 2007, Hodell's attorneys sent a letter to LSi, that read as follows:

Please be advised that we have been retained by Hodell-Natco Industries, Inc. . . . .

Hodell-Natco has been more than patient in extending the opportunity to [LSi] to provide integrated software with the agreed functionality. However, as of the date of this letter, the integrated software falls far short of the promised performance and we are compelled to declare [LSi] in material default of their agreements with Hodell-Natco, including the Development Agreement.

. . . .

Throughout the development process, it has been our client's objective to obtain integrated software with the agreed functionality operating at

-4-

acceptable performance levels. With the limited resources you have devoted to this project, that result simply has not occurred. If possible, our client would like to avoid litigation, but given the severe impact upon its business, Hodell-Natco will pursue all legal and equitable remedies available to it. You are requested to have your attorneys contact the undersigned within five (5) business days of the receipt of this letter to discuss an amicable resolution to this matter.

On July 26, 2007, LSi acknowledged receipt of the letter, asking Hodell, "[Y]ou are asking for remedies (ie money?) Correct?" An email from LSi the next day again addressed the "legal letter" and Hodell's dissatisfaction with LSi's performance.

On January 23, 2008, Hodell sent LSi an email stating, "We are offering you the chance to resolve this situation by refunding the TOTAL funds we've paid to LSI [sic] that are related to software licenses and maintenance fees." LSi responded, "[W]e must remain partners through out [sic] your migration. I cannot do that effectively under a threat of being sued every day. So all I am saying is if you are, then do it." Hodell emailed, "[D]on't you carry professional liability insurance for this type of issue? . . . In an effort to avoid a dragged-out lawsuit, we made a proposal to resolve this in a manner that gave us a small amount of relief, far short of our total cost . . . If we do not see relief, I can't assure you of no [sic] suit."

On November 21, 2008, Hodell filed suit against LSi and others in the Northern District of Ohio, asserting claims for fraud, breach of contract, negligence, and negligent misrepresentation arising from the performance issues with the software. On December 8, 2008, LSi first notified PIC of Hodell's claims against it. The issue before us is whether LSi gave PIC timely notice of Hodell's claim for purposes of coverage under either policy.

## II. Discussion

PIC issued two successive "claims made" professional liability insurance policies to LSi in 2007 and 2008.[5]  In order for LSi to have coverage under either policy, LSi was required to provide notice to PIC during the policy period of any "claim made against [it]" or "any circumstance which could reasonably be expected to give rise to a claim."  In the 2007 policy, a "claim" was defined as "a demand receive [sic] by the Insured for money, including the service of suit or institution of arbitration proceedings involving the Insured."  In the 2008 policy, the definition of a "claim" changed to "a demand received by you for money *or services*, including the service of suit or institution of arbitration proceedings involving you arising from any alleged wrongful act." (Emphasis added).  Both policies defined a "wrongful act" as a "negligent act, error, or omission committed or alleged to have been committed . . . in the rendering of professional services"and "professional services" as "services rendered to others for a fee . . . in the conduct of your profession."

In its coverage section, the 2007 policy provided coverage for "any Claim first made against the Insured and reported to the Company by written notice during the Policy Period"; provided "such Claim is by reason of a Wrongful Act committed[] During the Policy Period" or committed "Prior to the Policy Period . . . and [t]he Insured had no basis to believe that such Wrongful Act might reasonably be expected to give rise to a Claim under this Policy."  In contrast, the 2008 policy provided coverage for "any claim first made against you during the policy period . . . arising out of a wrongful act committed . . . prior to the end of the policy period."  Under the exclusion section, the 2008 policy stated "[t]his policy does not apply to any claim . . . arising out of, resulting from, based upon or in consequence of, directly or indirectly, any wrongful act committed prior to the policy period . . . which you had

___

[5]The 2007 policy was effective from April 23, 2007, to April 23, 2008; the 2008 policy was effective from April 23, 2008, to April 23, 2009.

any basis to believe might reasonably be expected to give rise to a claim under this Policy."

PIC maintains LSi has no coverage under the 2007 policy because LSi did not notify PIC of any claim or potential claim during the 2007 policy period. PIC further contends LSi has no coverage under the 2008 policy because the 2008 policy covered claims "first made" during the policy period and Hodell "first made" a claim against LSi before the 2008 policy went into effect. Hodell and LSi assert summary judgment was inappropriate because there is a genuine issue of material fact whether LSi received notice of an actual or potential claim before Hodell filed its lawsuit in November 2008.

We review a grant of summary judgment de novo, "viewing the record most favorably to the nonmoving party and drawing all reasonable inferences for that party." Munroe v. Cont'l W. Ins. Co., 735 F.3d 783, 786 (8th Cir. 2013). We also review the district court's construction of an insurance policy and interpretation of state law de novo.[6] Id.

Under Missouri law, the terms of an insurance policy are given "the meaning which would be attached by an ordinary person of average understanding if purchasing insurance." Seeck v. Geico Gen. Ins. Co., 212 S.W.3d 129, 132 (Mo. banc 2007) (quotation omitted). Because insurance policies are contracts, the general rules of contract construction are used in interpreting an insurance policy. Todd v. Mo. United Sch. Ins. Council, 223 S.W.3d 156, 160 (Mo. banc 2007). The policy is read as a whole to determine the parties' intent, and the language used in the policy is given its plain and ordinary meaning. Thiemann v. Columbia Pub. Sch. Dist., 338 S.W.3d 835, 839–40 (Mo. Ct. App. 2011). If, giving the language used its plain and

---

[6]The parties agree Missouri law applies.

ordinary meaning, the intent of the parties is clear and unambiguous, the policy is enforced according to its terms. Seeck, 212 S.W.3d at 132.

A claims made policy "provides coverage when the act or omission is discovered and brought to the attention of the insurer, regardless of when the act or omission occurred." Wittner, Poger, Rosenblum & Spewak, P.C. v. Bar Plan Mut. Ins. Co., 969 S.W.2d 749, 754 (Mo. banc 1998). Under a claims made policy, notice is especially important. Grissom v. First Nat'l. Ins. Agency, 371 S.W.3d 869, 874 (Mo. Ct. App. 2012).

> Notice must be given to the insurer during the policy period. If the insured does not give notice within the contractually required policy period, there is simply no coverage under a claims made policy, whether or not the insurer was prejudiced. This is because the event which invokes coverage in a claims made policy is transmittal of notice of the claim to the insurer. The very essence of a claims made policy is notice to the carrier within the policy period.

Id. at 874 (quotation omitted). Under a claims made policy, notice "defines the limits of the insurer's obligation—if there is no timely notice, there is no coverage." Lexington Ins. Co. v. St. Louis Univ., 88 F.3d 632, 634 (8th Cir. 1996).[7]

The district court concluded there was no coverage under the 2007 policy because LSi did not give notice of a claim or potential claim to PIC within the 2007 policy period. Hodell and LSi do not dispute this fact. We agree with the district court that, "[b]y the plain language of the [2007] policy, there is no coverage."

---

[7]Timely notice under a claims made policy "allows the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty." Lexington, 88 F.3d at 634 (quotation omitted).

The district court also found there was no coverage under the 2008 policy because it concluded the communications between Hodell and LSi from March 2007, when Hodell first experienced problems with the software, and April 23, 2008, the starting date of the 2008 policy, constituted a claim. In its email communications with LSi, Hodell complained about the problems with the software and demanded LSi fix the problems and cover the associated costs. The emails discussed Hodell's intent to bring in its "legal advisors" and LSi's expectation of being sued if the software problems were not corrected. In addition to the emails, the July 2007 letter from Hodell's attorneys advised LSi that the firm had been retained by Hodell, that Hodell was unhappy with the performance of the software, and that "Hodell-Natco will pursue all legal and equitable remedies available to it." The letter requested that LSi "have [their] attorneys contact the undersigned within five (5) business days of the receipt of this letter to discuss an amicable resolution of this matter." Cf. Berry v. St. Paul Fire & Marine Ins. Co, 70 F.3d 981, 983 (8th Cir. 1995) (letter sent by attorney "sufficiently demanding in tone and substance to qualify as a 'claim' within the meaning of the policy"). We agree with the district court that the communications "show that Hodell blamed LSi for the functionality problems of the [] software, requested that LSi fix the issues, and expected LSi to pay the associated costs."

Hodell and LSi assert the district court erred in finding the communications constituted a claim because it relied on the 2008 definition of a claim—which included "a demand for money or services"—but should have analyzed the communications under the 2007 definition of a claim—which defined a claim solely as "a demand for money." Hodell and LSi argue that Hodell did not make a claim against LSi prior to the start date of the 2008 policy because Hodell did not make a specific demand for *money*. As an initial matter, we question whether the definition of a claim in the 2007 policy would apply when determining coverage under the 2008 policy. Yet, we note that the definition of a claim in the two policies is the same in one key respect: Both include a "demand for money." The January 23, 2008, email from Hodell to LSi proposed "a chance to resolve this situation" with a refund of the

money Hodell paid "related to software licenses and maintenance fees." Hodell's email to LSi later that day asked LSi about its professional liability insurance and noted that, "[i]n an effort to avoid a dragged-out lawsuit, we made a proposal to resolve this in a manner that gave us a small amount of relief, far short of our total cost. . . . If we do not see relief, I can't assure you of no [sic] suit." While Hodell did not make a demand for a specific dollar amount, it proposed a "settlement" in exchange for a refund of the money Hodell paid for products and services. Regardless of which definition applies, the result is the same: The communications between Hodell and LSi prior to the date coverage began under the 2008 policy constituted a "demand for money" and therefore amounted to a "claim."

Hodell and LSi alternatively argue LSi was not required to give notice to PIC because the communications between Hodell and LSi represented dissatisfaction with LSi's performance of its contract—which would not be covered under the policy—rather than a claim of negligence. The undisputed evidence shows Hodell complained to LSi about the same acts and omissions Hodell eventually alleged in the underlying litigation. Further, Hodell never limited itself to a breach-of-contract claim. While the evidence may support the assertion Hodell believed LSi had breached its contract, Hodell made it clear to LSi it intended to pursue *all* legal and equitable remedies—not just a suit premised on breach of contract.

Hodell and LSi further assert PIC should have been required to show it was prejudiced by LSi's failure to give timely notice. This Court and others interpreting Missouri law have long held that Missouri law does not require an insurer to show prejudice under a claims made policy. See Lexington, 88 F.3d at 635 ("[The insurer] need not prove prejudice to deny coverage if the [insured] failed to report the [] claim during the policy term"); Wittner, 969 S.W.2d at 754 ("The prejudice requirement is generally not held to apply to claims made policies.").

Hodell and LSi argue <u>Lexington</u> and <u>Wittner</u> are inapposite to the facts of this case because PIC denied LSi's claim based on an exclusion in the 2008 policy, and Missouri law construes exclusions strictly against the insurer.[8] This argument ignores the fact that the district court found—and we agree—that the undisputed facts show Hodell made a claim against LSi prior to the 2008 policy period. The 2008 policy only provided coverage for claims "first made against [LSi] during the policy period." Accordingly, there was no coverage under the 2008 policy in the first instance, and we need not determine whether Missouri law would require PIC to show prejudice before denying coverage based on an exclusion.

### III. Conclusion

Accordingly, we affirm the judgment of the district court.

_____

---

[8]Hodell and LSi rely upon Missouri regulation 100-1.20 which provides: "No insurer shall deny any claim based upon the insured's failure to submit a written notice of loss within a specified time following any loss, unless this failure operates to prejudice the rights of the insurer."