

# SUPREME COURT OF MISSOURI
# en banc

JIMMIE LEE TAYLOR, )
)
          Appellant, )
)
v. ) No. SC94250
)
THE BAR PLAN MUTUAL INSURANCE )
COMPANY, )
)
          Respondent. )

### APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
The Honorable Sandra Midkiff, Judge

*Opinion issued March 10, 2015*

An attorney advised his client to make loans both to his law firm and to a business from which he received a commission for the referral. The attorney did not make a written disclosure or advise his client to seek independent legal advice, both of which are required by the rules of professional responsibility when entering a self-interested business transaction with a client. The loans were never repaid. After the client obtained a malpractice judgment against the attorney for breach of fiduciary duty, he sued the attorney's malpractice insurer seeking to recover the judgment under the policy. The trial

court granted summary judgment for the insurance company, finding that the "legal representative of investors" exclusionary clause denied coverage.

This Court affirms. The word "investment" in the exclusionary clause unambiguously encompasses the loans. No reasonable attorney purchasing this insurance would understand the policy to cover advising a client on these loans.

## Background

The facts are not in dispute. Plaintiff Jimmie Lee Taylor (Client) was the trustee and sole beneficiary of The Jimmie Lee Taylor and Leilla V. Taylor Revocable Trust (the trust).[1] Client retained attorney James Wirken (Attorney) to handle various legal claims pertaining to the management of the trust. Attorney was the 100 percent equity owner of his law firm, the Wirken Law Group (Law Group). Eventually, Attorney also came to represent Client and his wife in matters of their own estate planning and administration. As a result, Attorney became very familiar with Client's assets.

*The Law Group Loans*

Upon Attorney's advice, Client loaned the Law Group money three times. All three loans were short term and were executed by promissory notes personally drafted and guaranteed by Attorney. The first two loans were each for $100,000. The third was for $50,000. All three notes bore interest at 10 percent before default, 15 percent after default, and provided for attorney's fees in the event of default.

---

[1] Leilla V. Taylor, Client's mother, died shortly after Attorney began his representation of Client and the trust.

Attorney told Client he would be able to repay the loans because he had several contingent fee cases that would settle before the end of the year. In truth, Attorney did not know whether the cases would settle, much less in time to repay the loans. Client relied on the truthfulness of Attorney's statements, believing that Attorney was acting in his best interests. Unbeknownst to Client, Attorney and Law Group were in financial distress and had been rejected for loans by multiple lending institutions. Attorney had similar loan arrangements with numerous other clients, all of which were unpaid.

Attorney never advised Client that he should consult with another lawyer before making the loans, and he did not make any written disclosure regarding his ethical obligations—both of which are required by the Rule 4-1.8(a) when engaging in a business transaction with a client. Attorney admitted that, in drafting the notes and advising on the method of repayment, he was providing legal services and that he owed a fiduciary duty to Client. The loans were never repaid.

*The Longview Loans*

During the same year, Attorney directed Client to the Longview Village Development Company (Longview), another of Attorney's clients. Attorney told Client that Longview was looking for short-term lenders and that it was a "tremendous investment opportunity." Client made three loans to Longview in the amounts of $150,000, $90,000, and $21,740, with interest rates ranging from 32 to 36 percent.[2] All

---

[2] Client was told the loans were to be secured, variously, by a brokerage account, a second mortgage on a property in Kansas, and wealthy guarantors. Additionally, for the first of the loans, the interest was paid in advance and subtracted from the principal amount, so that funding

loans were executed via promissory notes and provided for attorney's fees in the event of default.  Attorney was paid a commission for delivering Client as a lender, but he did not advise Client of this arrangement, the fact that Longview owed Attorney money, or the advisability of obtaining other counsel regarding the transactions.  Attorney drafted the notes, which were signed by Longview.  Client transferred funds into Law Group's trust account, and Attorney transferred funds to Longview.  The loans were never repaid.

*Subsequent Litigation*

Client filed suit against Attorney and Law Group alleging breach of fiduciary duties.  The Bar Plan Mutual Insurance Company (Bar Plan), Attorney's malpractice insurer, provided Attorney and Law Group a defense under a reservation of rights.  It later withdrew its defense at Attorney's request.

After a bench trial, judgment was entered for Client.  The court found that an attorney-client relationship existed at all times relevant for all six loans.  Regarding the Law Group loans, it found that Attorney provided legal services to Client and the trust by structuring the terms of the loans and drafting the documents and personal guaranties.  Regarding the Longview loans, it found that Attorney provided legal services by structuring loan terms, drafting documents, and handling all communications and documents between Client and Longview.  The court found that Attorney breached his fiduciary duties to Client in regard to all six loans and that those breaches proximately caused damages in the amount of the loans' principal plus interest and attorney's fees.

---

the $150,000 loan cost Client only $138,000.  Client stood to make a profit when the note was repaid, which never occurred.

4

Client was awarded damages in the amount of $415,971.69 for the Law Group loans and $524,873.13 for the Longview loans.[3]

Client filed an equitable garnishment action to collect on the judgment by suing the Bar Plan directly under section 379.200, RSMo 2000. The Bar Plan filed for summary judgment, arguing both that there was no coverage under the policy and, if there was, that coverage was excluded under the "legal representative of investors" clause, section III(B)(4) of the policy. The trial court granted the Bar Plan summary judgment, holding that Attorney's injurious acts and omissions were covered by the policy but that coverage was excluded by section III(B)(4). Client appeals, contending that the trial court erred by finding no coverage.[4]

## Standard of Review

Review of an entry of summary judgment is *de novo*. *Floyd-Tunnell v. Shelter Mut. Ins. Co.*, 439 S.W.3d 215, 217 (Mo. banc 2014). Summary judgment is appropriate when the moving party has demonstrated, on the basis of facts as to which there is no genuine dispute, a right to judgment as a matter of law. *Id.*; Rule 74.04(c). Interpretation of an insurance policy and the determination of whether provisions are ambiguous are questions of law, subject to *de novo* review. *Floyd-Tunnell*, 439 S.W.3d at 217.

---

[3] Attorney ultimately admitted to numerous violations of Rules 4-1.8(a) and 4-1.15(c). On November 2, 2012, this Court accepted Attorney's voluntary surrender of his law license and disbarred him pursuant to Rule 5.25.

[4] This Court granted transfer after opinion by the court of appeals. MO. CONST. art. V, sec. 10.

**Analysis**

In an equitable garnishment action brought directly against an insurer, the plaintiff must prove that a judgment was obtained against an insurance company's insured during the policy period and that the injury is covered by the policy. Section 379.200; *Noll v. Shelter Ins. Cos.*, 774 S.W.2d 147, 150 (Mo. banc 1989). There is no question that Client obtained a judgment against Attorney, who was an insured under the policy. The question in this appeal is whether the policy provides coverage for Attorney's injurious acts and omissions.

*Interpretation of Insurance Policy Provisions*

The general rule when interpreting an insurance policy is to give the language its plain meaning. *Floyd-Tunnell*, 439 S.W.3d at 217. Typically, it is the meaning that would be attached by an ordinary lay person of average understanding if purchasing insurance. *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. banc 2009). The only possible purchaser of a legal malpractice insurance policy, however, is an attorney. As such, a legal malpractice insurance policy is given the meaning that would be attached by a reasonable attorney purchasing the policy.

When policy language is clear and unambiguous, the policy must be enforced as written and this Court will not resort to canons of construction. *Allen v. Cont'l W. Ins. Co.*, 436 S.W.3d 548, 554 (Mo. banc 2014). When language is ambiguous, it is construed against the insurer. *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. banc 2010). An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy. *Id.* A court may not create an ambiguity, however, to distort

6

policy language and enforce a construction it feels is more appropriate. *Rodriguez v. Gen. Accident Ins. Co. of Am.*, 808 S.W.2d 379, 382 (Mo. banc 1991).

The plaintiff must establish coverage under the policy, but the insurer must establish that an exclusion to coverage applies. *See Manner v. Schiermeier*, 393 S.W.3d 58, 62 (Mo. banc 2013). Exclusions are necessary provisions in insurance policies and are enforceable if they are clear and unambiguous. *Allen*, 436 S.W.3d at 554. Exclusionary clauses are construed strictly against the insurer. *Burns*, 303 S.W.3d at 510.

*General Insuring Clause*

If Attorney's acts or omissions do not fall within the scope of the policy's general insuring clause, then judgment in favor of the Bar Plan was proper and this Court need not reach the exclusion. Section II(A) of the policy provides, in relevant part, that "[t]he Company will pay on behalf of an Insured all sums, subject to the Limit(s) of Liability, Exclusions, and terms and conditions contained in this Policy, which an Insured shall become legally obligated to pay as Damages … by reason of any act or omission by an Insured acting in a professional capacity providing Legal Services."

The Bar Plan argued in its summary judgment motion that Attorney's injurious acts and omissions did not involve the providing of legal services and so were not within the scope of the general insuring clause. The trial court rejected this argument as an "unduly myopic view of the law practice," relying instead on an exclusionary clause in granting summary judgment. The trial court specifically found that Attorney provided Client with legal services in connection with the loans. As the Bar Plan has now

abandoned this argument, this Court holds that Attorney's acts and omission fall under the general insuring clause of the policy.

*Section III(B)(4) Exclusion*

Section III(B)(4) provides:

III. Exclusions

THIS POLICY DOES NOT PROVIDE COVERAGE FOR ANY CLAIM BASED UPON OR ARISING OUT OF:
…
B. An Insured's capacity as:
…
4. A legal representative of investors in regard to and resulting in investment in an enterprise in which an Insured owns an equity interest or for which the Insured receives a fee or commission from an Entity other than the Investor.

The trial court found that both sets of loans fell within the exclusion. The loans to Law Group were excluded because Attorney legally represented Client when he made investments in an "enterprise in which an Insured owns an equity interest," as Attorney was the 100 percent owner of Law Group. The Longview loans were excluded because Attorney legally represented Client regarding investments "for which the Insured receives a fee or commission from an Entity other than the Investor," because Attorney received a commission in exchange for delivering Client as a lender.

Client argues, however, that the trial court failed to determine that, under section III(B)(4), Client was an "investor[]" or that the loans were "investment[s] in an enterprise." He asserts that these terms are ambiguous because they are subject to multiple meanings. He contends that the ordinary meaning of "invest" implies a purchase of some kind, which is reflected by the definition of the word "invest" from the *American*

8

*Heritage Dictionary*: "[t]o purchase with the expectation of benefit." AM. HERITAGE DICTIONARY 922 (5th ed. 2011). As a result, he argues that in the context of section III(B)(4), an "investment" requires a purchase of equity and cannot encompass a debt instrument such as a loan. Client never received an equitable share or interest in Law Group or Longview, and so he asserts that a reasonable attorney might conclude that the loans were not encompassed by section III(B)(4).

Yet there are other definitions for "invest" and "investment," some of which do not imply a purchase to expect benefit. Client's own cited dictionary, for example, also defines "invest" as "commit[ting] (money or capital) in order to gain a financial return." *Id.* at 922. Furthermore, *Webster's* dictionary defines "investment" as "an expenditure of money for income or profit or to purchase something of intrinsic value[;] capital outlay." WEBSTER'S THIRD NEW INT'L DICTIONARY 1190 (1993). *Black's Law Dictionary* defines it as "[a]n expenditure to acquire property or assets to produce revenue; a capital outlay." BLACK'S LAW DICTIONARY 902 (9th ed. 2009).

The many definitions of "invest" and "investment" are not exclusive of each other, and multiple definitions do not make "investment" ambiguous. Rather, they show that the term is broad—an investment is *both* an outlay of funds with the expectation that some income or profit will result *and* a purchase with the expectation of receiving a benefit. *See Bar Plan Mut. Ins. Co. v. Chesterfield Mgmt. Assocs.*, 407 S.W.3d 621, 629 (Mo. App. 2013) ("[m]ultiple or broad meanings do not necessarily create ambiguity … there is often a deliberate purpose in using a word with a broad meaning or multiple meanings in a contract, namely to achieve a broad purpose.").

9

Loans may not be investments in every circumstance. That does not mean, however, that a loan can never can be considered an investment, particularly when the loan offers the expectation of profit or income.[5] Client clearly expended money with expectation of profit, as defined in the multiple dictionaries cited above. In exchange for these loans, Client acquired a right to repayment that had significant value and was not, as he argues, "[s]imple interest due on [] short-term loan[s]." Each loan bore a high interest rate (10 to 36 percent) and provided for attorney's fees in the event of default. Further, in the first Longview loan, Client paid $138,000 on a $150,000 loan—Longview effectively paying the interest up front and Client standing to make a large profit when the note was repaid. This arrangement was the functional equivalent of a "zero-coupon bond transaction."[6] Client agrees that purchasing a company's bond (a debt instrument) could qualify as an investment under the policy, but he argues that simple interest due on short-term loans does not. This Court disagrees. Client's funding of the loans was an expenditure of money for income or profit, and a reasonable lawyer would conclude that "investment" in Section III(B)(4) broadly encompassed these loans.

Again, the ultimate question is what a reasonable attorney purchasing this policy would expect to be covered and excluded from coverage. A fair reading of this policy is

---

[5] While the subjective beliefs of Attorney or Client regarding how to characterize the loans are not relevant to the "reasonable attorney" standard, it is worth noting that the record reflects both Attorney and Client referred to the Longview loans colloquially as investments, underscoring the unreasonableness of Client's proposed construction of section III(B)(4).

[6] In a zero-coupon bond transaction, the purchaser (the lender) pays the issuer (the borrower) something lower than the face value of the bond at the outset, in lieu of receiving the periodic interest payments typical of a normal bond. BLACK'S LAW DICTIONARY at 205. The effect is that the bond bears no interest. *Id.* The bondholder turns a profit at maturity when the issuer pays the bond's face value. *Id.*

that section III(B)(4) unambiguously excludes transactions when the covered attorney is paid a fee or commission from an entity other than the attorney's client or the client invests in an enterprise that the attorney owns. In other words, a reasonable attorney would recognize that section III(B)(4) is concerned with conflicts of interest when engaging in business transactions with clients. A reasonable attorney would not read section III(B)(4) and understand it to mean that self-interested transactions with clients were excluded from coverage *unless* they were labeled as loans. Viewed in this context, the Bar Plan's use of the term "investment" was not ambiguous. The broad term was used to achieve section III(B)(4)'s purpose: to encompass and exclude from coverage malpractice claims arising from an attorney's self-interested transactions with clients who committed money to receive income or profit, whether through equity or debt.[7]

Accordingly, this Court holds that Client's narrow interpretation of "investment" requiring an equity purchase is mistaken. Under the facts of this case, the trial court was correct in holding that section III(B)(4) unambiguously excluded the loans.

*Concurrent Proximate Cause*

Client next argues that even if section III(B)(4) is unambiguous, there must still be coverage because his injury was not solely "based upon or arising out of [Attorney's capacity as] a legal representative of investors." He claims that Attorney's "general"

---

[7] Client also argues that, as a non-lawyer, he was legally barred from investing in the Law Group and so a reasonable attorney would know that the Law Group loans could not be investments for purposes of section III(B)(4). *See* Section 356.111, RSMo 2000 (prohibiting law firms from issuing *ownership* shares to non-lawyers). Client's argument assumes its own conclusion—that an investment may only refer to an equity purchase. As discussed above, this argument is without merit.

11

breach of fiduciary duties in his representation of Client and the trust was also a cause of the harm—a cause that was distinct from the loans' status as "investment[s]" under section III(B)(4). Client argues that Attorney's breaches of fiduciary duties, which were necessarily determined in the underlying malpractice lawsuit, were not excluded by the policy, and there must be coverage.

Client asks this Court to apply the "concurrent proximate cause" rule, which states that "an insurance policy will be construed to provide coverage where an injury was proximately caused by two events—even if one of these events was subject to an exclusion clause—if the differing allegations of causation are independent and distinct." *Intermed Ins. Co. v. Hill*, 367 S.W.3d 84, 88 (Mo. App. 2012) (internal quotations omitted).[8] The rule is usually applied in a negligent supervision context. For example, an employer's general liability insurance will typically exclude injuries arising from use or ownership of a vehicle or gun. As a result, an individual harmed by a company vehicle or by a gun on company property will be unable to recover from the employer's insurance company. The concurrent proximate cause rule, however, may allow the injured plaintiff to recover, despite the exclusion, if he or she can point to a cause, such as

_____

[8] In *Intermed*, a physician's assistant (PA) at a medical center sexually assaulted a patient while conducting an unnecessary procedure. 367 S.W.3d at 86. The employer's insurance policy excluded coverage for liability arising from sexual relations, activity, acts or conduct. *Id.* The victim instead sought to recover from the employer on a theory of negligent supervision and retention because the PA had been known to engage in unnecessary procedures, particularly with female patients. *Id.* at 89-90. The court held that the failure to monitor or dismiss the PA was a non-excluded concurrent cause of the victim's injury because the PA's propensity to engage in unnecessary procedures could have resulted in multiple kinds of injury, and it was only incidental that it in fact resulted in an injury excluded by the policy. *Id.* In other words, the non-excluded cause was totally independent of the excluded cause.

12

negligent supervision or hiring, that is covered under the policy and is wholly separate from the excluded cause.

For the rule to apply, the injury must have resulted from a covered cause that is truly "independent and distinct" from the excluded cause. *See Am. States Ins. Co., Inc. v. Porterfield*, 844 S.W.2d 13, 14 (Mo. App. 1992) (concurrent cause of negligent supervision rejected when trailer driven by insured came unhitched and injured plaintiff because injuries arose out of use of the truck, not negligent supervision).

The concurrent proximate cause rule has no applicability to this case as there is no readily identifiable independent cause of the injury. Client's attempt to break down the actions of Attorney into two distinct parts to be analyzed independently under the policy is unpersuasive. Rather, "both" causes relate to Attorney's decision to engage in self-interested transactions with Client. This is evident given that the underlying judgment against Attorney (from which Client argues the concurrent cause stems) was based solely upon fiduciary breaches related to the self-interested transactions.

### *Use of "And" in Section III(B)*

Finally, Client argues that the entirety of Section III(B) is inapplicable because its four subparts are connected with "and" and not "or," making the provision conjunctive, essentially one exclusion. Section III(B) provides, in full:

III. Exclusions

THIS POLICY DOES NOT PROVIDE COVERAGE FOR ANY CLAIM BASED UPON OR ARISING OUT OF:
…
B. An Insured's capacity as:

1. A public official or employee of a governmental body, subdivision, or agency; provided, however, that if independent of that capacity, the Insured is also regularly engaged in the provision of Legal Services in return for financial remuneration, this exclusion shall not apply, but in that event, the insurance afforded by this Policy shall be excess over any other applicable, valid and collective insurance or indemnity provided under law, rule, regulation or Policy applicable to such governmental body, subdivision or agency, notwithstanding any other language in this Policy;

2. A fiduciary under the Employee Retirement Income Security Act of 1974 [ERISA] and its amendments or any regulation or order issued pursuant thereto, except if an Insured under this Policy, is deemed to be a fiduciary solely by reason of rendering Legal Services in a professional capacity with respect to an employee benefit plan;

3. An investment advisor, securities broker or dealer, insurance agent or broker, real estate agent or broker or accountant; and

4. A legal representative of investors in regard to and resulting in investment in an enterprise in which an Insured owns an equity interest or for which the Insured receives a fee or commission from an Entity other than the Investor.

Client argues that, due to the exclusion's use of "and" rather than "or," it is reasonably possible for Section III(B) to be read as excluding coverage only if the insured is simultaneously acting in the capacity of all four roles listed in each subpart.

This Court has held that "and" most commonly means "along with or together with." *Burns*, 303 S.W.3d at 511. However, in particular fact situations, "and" can mean "as well as, in addition to, and also" – in other words, "or." *Id.* This is such a fact situation. Under Client's interpretation, for the exclusion to apply, the insured would

14

have to be acting simultaneously as (1) a public official, (2) an ERISA fiduciary, (3) an investment advisor/securities broker/insurance agent/real estate agent/accountant, and (4) a lawyer representing investors regarding investments in enterprises that the lawyer either owns or receives a commission. It is difficult to imagine a scenario in which such an exclusion could ever apply. Client's reading renders the language essentially meaningless.[9]

A reasonable attorney purchasing this policy would understand Section III(B) to unambiguously contain four separate numbered exclusions. This Court will not distort policy language to create ambiguity where none exists. *Rodriguez*, 808 S.W.2d at 382.

**Conclusion**

The judgment is affirmed.

_____
Mary R. Russell, Chief Justice

Breckenridge, Stith, Draper, and Teitelman, JJ.,
and Richardson and Zerr, Sp.JJ, concur.
Fischer and Wilson, JJ., not participating.

---

[9] Indeed, such a reading has inherent contradictions given that subpart (4) requires the insured to be acting as a lawyer, while subpart (3) requires the insured to be acting as a professional *other* than a lawyer.

15