

# In the Missouri Court of Appeals Eastern District

## DIVISION FOUR

ELIZABETH A. RUIZ, PERSONAL
REPRESENTATIVE OF THE ESTATE OF
MARCIA A. PAUL,

        Appellant,

vs.

THE BAR PLAN MUTUAL INSURANCE
COMPANY,

        Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

No. ED106926

Appeal from the Circuit Court
of St. Louis County

Honorable David L. Vincent, III

FILED: September 3, 2019

## Introduction

Elizabeth A. Ruiz ("Ruiz") appeals the trial court's grant of summary judgment in favor

of The Bar Plan Mutual Insurance Company ("The Bar Plan") on her equitable garnishment

claim filed on behalf of the estate of Marcia A. Paul ("Decedent"). Ruiz brought her claim

against The Bar Plan to collect on a legal malpractice judgment entered in favor of Decedent

against The Bar Plan's insured, Charles H. Steib ("Steib"). Steib renewed a claims-based

professional liability insurance policy with The Bar Plan ("the Policy") effective in 2009. In the

Policy, coverage for claims based upon conduct occurring before the issuance of the Policy was

conditioned on Steib notifying The Bar Plan, at the time of the Policy renewal application, of any

act or omission that he had a basis to believe might give rise to a claim against him. The trial

court determined that the Policy did not afford coverage for Ruiz's legal malpractice claims

because Steib did not report Decedent's potential malpractice claims against Steib to The Bar Plan when he reapplied for insurance coverage.

Ruiz raises several points on appeal, each of which is premised upon Ruiz's contention that Steib fully complied with the Policy's notice requirements because he reasonably believed no malpractice claim could be brought against him on behalf of Decedent following Decedent's death. It is not disputed that coverage under the Policy was expressly conditioned upon Steib reporting any acts or omissions that could reasonably be expected to form the basis of a legal malpractice claim against him by Decedent. Because an objectively reasonable attorney in 2008 would have understood that claims of legal malpractice survived a client's death, Steib was obligated to notify The Bar Plan of Decedent's potential malpractice claim when applying to renew the Policy in 2008. Because Steib did not notify The Bar Plan of the potential claim against him, the Policy affords no coverage for Ruiz's claims. Accordingly, we affirm the judgment of the trial court.

<u>Factual and Procedural History</u>

## I.      **The Legal Malpractice Claims Underlying the Equitable Garnishment Action**

Ruiz's legal malpractice claims against Steib arose from Steib's representation of Decedent in a declaratory judgment proceeding stemming from a medical malpractice judgment. Decedent obtained a $750,000 settlement against Dr. Enrique Pastrana ("Dr. Pastrana") in a medical malpractice case. Decedent and Dr. Pastrana entered into a Section 537.065[1] settlement agreement, which stipulated that Decedent could collect on the settlement with Dr. Pastrana only from Dr. Pastrana's liability insurer, Intermed Insurance Company ("Intermed"). When Decedent sought to collect on the settlement, Intermed filed a declaratory judgment action

---

[1] All Section references are to RSMo (2016), unless otherwise indicated.

2

seeking a ruling that Dr. Pastrana's liability policy did not cover Decedent's claims. Intermed moved for summary judgment on its petition and submitted therewith a statement of uncontroverted facts. Steib, representing Decedent, did not properly respond to Intermed's statement of uncontroverted facts.

On July 18, 2007, the trial court granted summary judgment to Intermed. The trial court explained that Decedent did not respond to Intermed's statement of uncontroverted facts as required by Rule 74.04(c)(2),[2] causing the trial court to treat each of Intermed's facts as admitted by Decedent. Included among the admissions was the fact that Decedent's claims were not covered by Dr. Pastrana's liability policy with Intermed. The trial court found Steib's response noncompliant with Rule 74.04. The trial court admonished that it "acknowledge[d] the difficulty of [Decedent's] position but [was] nevertheless constrained by the requirements of Rule 74.04(c)(2) and the decisions of the appellate courts, which treat as true any facts alleged in a properly pleaded summary judgment motion not disputed by the non-movant." Consequently, the trial court found Intermed's uncontroverted facts admitted and, as a matter of law, granted summary judgment in favor of Intermed. Because of Steib's error, Decedent was unable to continue her efforts to collect on the $750,000 medical malpractice judgment against Dr. Pastrana.

Decedent appealed the trial court's grant of summary judgment to Intermed. On March 11, 2008, this Court affirmed the trial court's grant of summary judgment in a per curiam order. Intermed Ins. Co. v. Paul, 247 S.W.3d 103, 104 (Mo. App. E.D. 2008) (per curiam). In the memorandum accompanying the order, we explained that Rule 74.04(c)(2) set forth the requirements for Decedent's response to Intermed's statement of uncontroverted facts. We noted

---

[2] All Rule references are to Mo. R. Civ. P. (2016), unless otherwise indicated.

that compliance with Rule 74.04 is mandatory and that Decedent failed to comply with Rule 74.04 when Steib did not admit or deny each factual statement contained in the summary judgment motion. We held that the trial court properly treated Intermed's factual assertions as true, given that Decedent—due to Steib's error—did not dispute them. Because the facts as asserted by Intermed voided coverage under Dr. Pastrana's insurance policy, we held the trial court properly granted summary judgment in favor of Intermed.

Steib then mailed Decedent a copy of the per curiam order. Shortly thereafter, on July 3, 2008, Decedent died. Ruiz was appointed the personal representative of Decedent's estate.

## II. The Bar Plan Policy

Steib, through his law firm, submitted a Policy renewal application to The Bar Plan in December 2008. Section II Coverage of the Policy—effective January 21, 2009—contains the following insuring clause:

> **A. PROFESSIONAL LIABILITY AND CLAIMS-MADE AND REPORTED CLAUSE:**
> The Company will pay on behalf of an Insured all sums, subject to the Limit(s) of Liability, Exclusions and terms and conditions contained in this Policy, which an Insured shall become legally obligated to pay as Damages as a result of CLAIMS (INCLUDING CLAIMS FOR PERSONAL INJURY) FIRST MADE AGAINST AN INSURED DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENSION PERIOD COVERAGE AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD, THE AUTOMATIC EXTENDED CLAIM REPORTING PERIOD, OR ANY APPLICABLE EXTENSION PERIOD COVERAGE by reason of any act or omission by an Insured acting in a professional capacity providing Legal Services.
>
> **PROVIDED ALWAYS THAT** such act or omission happens:
> 1. During the Policy Period; or
> 2. Prior to the Policy Period, provided that prior to the effective date of this Policy:
>     a. Such Insured did not give notice to the Company or any prior insurer of any such act or omission; and
>     b. Such Insured had no basis to believe that such Insured had committed such an act or omission.
>
> NOTE: It is a condition precedent to coverage under this Policy that all Claims be reported in compliance with Section VII. CLAIMS, Paragraph A.

4

(formatting in original).

Under Section III Exclusions, Exclusion L expressly excludes coverage for any claim based upon or arising out of "[a] Claim against an Insured who *before the Policy effective date* knew, or should reasonably have known, of any circumstance, act or omission that might reasonably be expected to be the basis of that Claim" (emphasis added).

In the December 2008 Policy renewal application, Steib affirmatively denied that his firm or any attorney or employee in the firm had knowledge of any incident, circumstance, act or omission, which may give rise to a claim not previously reported.

Steib then sought and recovered attorneys' fees against Decedent's estate for his representation of Decedent in the declaratory judgment action.

## III.    Ruiz's Legal Malpractice Judgment

On November 3, 2009, Ruiz filed a lawsuit against Steib on behalf of Decedent's estate alleging legal malpractice resulting from Steib's representation of Decedent during the Intermed declaratory judgment action. On November 19, 2009, Steib notified The Bar Plan of the claim, and The Bar Plan initially defended Steib. However, The Bar Plan later terminated coverage due to the Policy's insuring clause and Exclusion L. The Bar Plan explained that prior to the Policy period, Steib had reason to know—but had not notified The Bar Plan—that Decedent might have brought a claim against Steib due to his mishandling of the Intermed declaratory judgment action.

In December 2010, Ruiz amended her petition to include another legal malpractice claim arising from the same declaratory judgment action, alleging that Steib should have cited additional case law in the declaratory judgment action to avoid the entry of summary judgment. The Bar Plan denied coverage for this additional claim.

5

In November 2011, Ruiz informed The Bar Plan of her settlement demand on Steib, and The Bar Plan again denied coverage for Steib. On June 1, 2012, Ruiz and Steib entered into a consent judgment, approved and entered by the circuit court, against Steib in the amount of $750,000, pursuant to the terms of a Section 537.065 agreement.[3]

## IV. Ruiz's Equitable Garnishment Action against The Bar Plan

In October 2016, Ruiz filed an equitable garnishment action to collect from The Bar Plan the $750,000 consent judgment entered in the legal malpractice case against Steib. Ruiz and The Bar Plan each moved for summary judgment. The trial court granted summary judgment in favor of The Bar Plan. The trial court determined that the Policy did not provide coverage for Decedent's malpractice claim because, under the Policy's insuring clause and Exclusion L, Steib first reported the claim to The Bar Plan on November 19, 2009, and did not disclose the potential claim in his December 2008 renewal application (submitted prior to the Policy's effective date of January 21, 2009) despite having reason to know that he might be sued for the acts or omissions from which Decedent's legal malpractice claim arose.

Ruiz now appeals.

### Points on Appeal

Ruiz challenges the trial court's entry of summary judgment in favor of The Bar Plan in four separate points on appeal. In her first two points, Ruiz disputes the Bar Plan's denial of coverage under the Policy's insuring clause (Point One) and Exclusion L (Point Two). Ruiz's third point similarly challenges the denial of coverage for her amended claim alleging Steib's failure to cite the correct law in the declaratory judgment action. The continuing theme throughout these three points is that Steib fully complied with the notice requirements of the

---

[3] The consent judgment amount of $750,000 derives from amount of the original medical malpractice judgment.

Policy when completing his Policy renewal application because Steib could not have known, under the objectively-reasonable-attorney standard, that his acts or omissions while representing Decedent might give rise to a legal malpractice claim. Lastly, in Point Four, Ruiz reasons that because the Policy provides coverage for her claims, summary judgment should not have been granted to The Bar Plan on her corresponding claim of bad faith failure to settle ("BFFS").

## Standard of Review

We review a trial court's grant of summary judgment de novo. Shiddell v. Bar Plan Mut., 385 S.W.3d 478, 482–83 (Mo. App. W.D. 2012) (internal citation omitted); see also ITT Comm. Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993). "Summary judgment is appropriate when the moving party has demonstrated, on the basis of facts as to which there is no genuine dispute, a right to judgment as a matter of law." Taylor v. Bar Plan Mut. Ins. Co., 457 S.W.3d 340, 344 (Mo. banc 2015) (citing Rule 74.04(c); Floyd-Tunnell v. Shelter Mut. Ins. Co., 439 S.W.3d 215, 217 (Mo. banc 2014)). "[A] 'genuine issue' exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts." Shiddell, 385 S.W.3d at 483 (quoting ITT Comm. Fin. Corp., 854 S.W.2d at 382). We may affirm a trial court's summary judgment decision under any theory supported by the record. Burns v. Smith, 303 S.W.3d 505, 509 (Mo. banc 2010) (internal citation omitted).

We also give de novo review to the interpretation of insurance policy coverage, which presents questions of law. Floyd-Tunnell, 439 S.W.3d at 217 (citing Burns, 303 S.W.3d at 509).

## Discussion

### I.    Policy Coverage

Are Ruiz's legal malpractice claims against Steib covered under the Policy, thereby allowing Ruiz to recover on her equitable garnishment claim against The Bar Plan? This appeal is resolved by answering one fundamental question: Did Steib, when completing his Policy

7

renewal application with The Bar Plan in December 2008, have reason to know that Decedent might have a basis for bringing a legal malpractice claim against him due to his failures in the Intermed declaratory judgment action? If we answer in the affirmative, then Steib's failure to report the potential claim in his renewal application precludes coverage. Because all of Ruiz's points on appeal are resolved on this dispositive issue of coverage, we address them together.

"In an equitable garnishment action brought directly against an insurer, the plaintiff must prove that a judgment was obtained against an insurance company's insured during the policy period and that the injury is covered by the policy." Taylor, 457 S.W.3d at 344 (citing Section 379.200). It is not disputed that Ruiz obtained a judgment against Steib, that Ruiz's judgment arose from Steib's representation of Decedent in the declaratory judgment action, and that the declaratory judgment action concluded prior to the issuance of the Policy. See id. Ruiz may prevail in her equitable garnishment action against The Bar Plan only if the Policy provided insurance coverage for the judgment Ruiz obtained on her claims against Steib.

The Policy at issue in this appeal is a "claims-made" policy. "Occurrence insurance policies generally provide coverage for an event that occurs during the policy period, regardless of when a claim is asserted. Claims[-]made policies do not. Instead, claims[-]made policies are triggered by the date the claim is made upon the insured." Wittner, Poger, Rosenblum & Spewak, P.C. v. Bar Plan Mut. Ins. Co., 969 S.W.2d 749, 752 (Mo. banc 1998). A claims-made policy protects the insured only against claims made during the life of the policy. Landry v. Intermed Ins. Co., 292 S.W.3d 352, 356 (Mo. App. W.D. 2009) (citing Cont'l Cas. Co. v. Maxwell, 799 S.W.2d 882, 887 (Mo. App. W.D. 1990)). "In exchange for limiting coverage only to claims made during the policy period, the carrier provides the insured with retroactive

8

coverage for errors and omissions that took place prior to the policy period." Cont'l Cas. Co., 799 S.W.2d at 887 (internal quotation omitted).

Our starting point for determining coverage under an insurance policy is the policy's insuring clause. Nooter Corp. v. Allianz Underwriters Ins. Co., 536 S.W.3d 251, 299 (Mo. App. E.D. 2017) (internal citation omitted). "If [an] [a]ttorney's acts or omissions do not fall within the scope of the policy's general insuring clause, then . . . this Court need not reach the exclusion." Taylor, 457 S.W.3d at 345. Regarding exclusion clauses, "[t]he plaintiff must establish coverage under the policy, but the insurer must establish that an exclusion to coverage applies." Id. at 344 (citing Manner v. Schiermeier, 393 S.W.3d 58, 62 (Mo. banc 2013)). "[T]he ultimate question is what a reasonable attorney purchasing this policy would expect to be covered and excluded from coverage." Id. at 346.

Here, both Ruiz and The Bar Plan recognize the presence of two determinative clauses in the Policy: the insuring clause and Exclusion L. The Policy's insuring clause makes the reporting of potential claims a condition precedent to coverage. The notice requirement of a policy defines the limits of the insurer's obligations. See, Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co., 712 F.3d 336, 342 (7th Cir. 2013) (internal quotations omitted). "The notice requirement is material, and of the essence of the contract." Id.

Under its express terms, a claim arising out of an unreported act or omission occurring prior to the effective date of the Policy is covered under the Policy only if the insured did not report the potential claim because the "[i]nsured had no basis to believe that such [i]nsured had committed such an act or omission." The corresponding Exclusion L explains that the Policy does not afford coverage for any claim based upon or arising out of "[a] [c]laim against an

9

[i]nsured who before the Policy effective date knew, or should reasonably have known, of any circumstance, act or omission that might reasonably be expected to be the basis of that [c]laim."

Both Ruiz and The Bar Plan agree that the controlling standard for coverage in claims-made policies is governed by Wittner. 969 S.W.2d at 754. Addressing highly similar policy language as here, Wittner clarified that in a claims-made insurance policy, "[t]he coverage requirement for acts or omissions that occurred prior to the policy period is not the subjective belief of the insured whether a claim will be made." Id. Rather, courts employ the standard of an objectively reasonable attorney and inquire whether the record shows that the attorney had reason to know his acts or omissions could give rise to a claim. See id.; see also City of Brentwood, Mo. v. Northland Ins. Co., 397 F. Supp. 2d 1143, 1148 (E.D. Mo. 2005) (internal citations omitted) (applying Missouri law) (noting that the subjective belief of an insured about a potential claim does not negate the duty to report it); Gen. Star Nat. Ins. Co. v. Miller Law Firm, P.C., 05-0631-CV-W-HFS, 2007 WL 2782517, at *2 (W.D. Mo. Sept. 20, 2007) (applying Missouri law) (providing that "the test is what a reasonable attorney would believe under the circumstances"). Thus, we must determine whether in December 2008, a reasonable attorney in Steib's position should have known that the facts and circumstances surrounding his representation of Decedent in the declaratory judgment action might lead to a potential malpractice claim that he was obligated to report in the Policy renewal application.

Reporting potential claims is the default expectation under claims-made policies, because "[c]laims[-]made policies place special reliance on notice." Landry, 292 S.W.3d at 356; see also Lexington Ins. Co. v. St. Louis Univ., 88 F.3d 632, 634 (8th Cir. 1996) (noting that Missouri jurisprudence emphasizes the necessity of timely notice in claims-made policies). "Notice must be given to the insurer during the policy period. If the insured does not give notice within the

contractually required policy period, there is simply no coverage under a claims[-]made policy[.]" Grissom v. First Nat. Ins. Agency, 371 S.W.3d 869, 874 (Mo. App. S.D. 2012) (quoting Landry, 292 S.W.3d at 356). "Because the reporting requirement helps define the scope of coverage under a claims[-]made policy, to excuse a delay in notice beyond the policy period would alter a basic term of the insurance policy." Wittner, 969 S.W.2d at 754 (internal quotation omitted); see also Bar Plan Mut. Ins. Co. v. Chesterfield Mgmt. Assocs., 407 S.W.3d 621, 625 (Mo. App. E.D. 2013) (describing a similar claims-made policy as a claims-made-*and-reported* policy). Indeed, "[t]his interpretation melds with the concept of fortuity, a fundamental premise of insurance law. Insurers do not usually contract to cover preexisting risks and liabilities known by the insured. Thus, it is generally the insured's duty to provide truthful and complete information so the insurer can fairly evaluate the risk it is contracting to cover." Bryan Bros. Inc. v. Cont'l Cas. Co., 660 F.3d 827, 831 (4th Cir. 2011); see also Lexington Ins. Co., 88 F.3d at 634 (requiring compliance with the reporting requirement for coverage).

Here, the Policy's insuring clause expressly imposes a reporting requirement for any claim arising from acts or omissions preceding the policy period, and excuses the non-reporting of a potential claim only if "[s]uch [i]nsured had no basis to believe that such [i]nsured had committed such an act or omission." Thus, the Policy's insuring clause provides coverage for acts or omissions occurring prior to the policy-period *only if* the attorney had no reason to know that such act or omission might give rise to a claim. See Wittner, 969 S.W.2d at 752–53 (internal citation omitted) (interpreting a nearly identical insuring clause requiring that "an insured had no basis to believe that the [i]nsured had committed such an act or omission"). The reporting requirement of the insuring clause is reinforced by Exclusion L, which expressly excludes coverage for any claim based upon or arising out of a claim against the insured "who before the

11

Policy effective date knew, or reasonably should have known, of any circumstance, act or omission that might reasonably be expected to be the basis of that [c]laim."

Applying the objective standard in Wittner, we are persuaded that a reasonable attorney in Steib's position would have known that he had committed an act or omission during his representation of Decedent in the Intermed declaratory judgment action that reasonably might be expected to form the basis of a legal malpractice claim against him. See Wittner, 969 S.W.2d at 754. We further reject Ruiz's argument that Steib could reasonably believe that Decedent's death relieved Steib from the notification requirements of the Policy renewal application.

A. Steib could have reasonably expected a legal malpractice claim might arise from his representation of Decedent in the Intermed declaratory judgment action

As an initial matter, we are unpersuaded by and categorically reject Ruiz's argument that a reasonable attorney in Steib's position would not recognize that his error in the Intermed declaratory judgment action might give rise to a malpractice claim. Steib failed to comply with the mandatory requirements of Rule 74.04 and consequently lost a dispositive motion that lost his client the benefit of a $750,000 judgment. See, e.g., Wittner, 969 S.W.2d at 753 n.2 (suggesting that even "mere notice of the entry of a default decree against a client the firm was retained to represent in a particular matter would constitute a 'basis to believe that the insured committed such an act or omission'" triggering the policy's reporting requirement); SKMDV Holdings, Inc. v. Green Jacobson, P.C., 494 S.W.3d 537, 557 (Mo. App. E.D. 2016) (internal citations omitted) (discussing examples of "clear and palpable" attorney errors, such as allowing a statute of limitations to run on a client's claim or omitting a requested contract term); see also Vintila v. Hopkins, 1:15-CV-14 SNLJ, 2016 WL 3031407, at *4 (E.D. Mo. May 27, 2016) (applying Missouri law) (denying coverage under a claims-made policy where the attorney failed to notify the insurer of a potential claim after letting the statute of limitations run on a client's

12

case despite the attorney's subjective belief that he had a good defense to the potential claim). Other jurisdictions applying the same objective-attorney standard as Wittner to similarly worded claims-made policies corroborate our position. See, e.g., Koransky, 712 F.3d at 341–44 (interpreting a similar policy provision under Indiana law to find that a reasonable attorney would realize that his client might bring a malpractice claim when his failure to deliver a sales contract compromised the transaction); Coregis Ins. Co. v. Baratta & Fenerty, Ltd., 264 F.3d 302, 307 (3d Cir. 2001) (noting that "[w]hen an attorney has a basis to believe he has breached a professional duty, he has a reason to foresee that his conduct might be the basis of a professional liability claim against him"); Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP, 793 F. Supp. 2d 399, 411 (D.D.C. 2011) (finding "the dismissal of a lawsuit because of attorney error would clearly put a lawyer on notice of the possibility of a malpractice claim.").

Importantly, even if Steib subjectively believed his pleading error was not one that might give rise to a malpractice claim, under the objectively-reasonable-attorney standard, Steib's subjective belief does not release him from his duty to report the potential claim under the Policy's insuring clause.[4] See Wittner, 969 S.W.2d at 754; see also City of Brentwood, Mo., 397 F. Supp. 2d at 1148; Vintila, 1:15-CV-14 SNLJ, 2016 WL 3031407, at *4; Gen. Star Nat. Ins. Co., 05-0631-CV-W-HFS, 2007 WL 2782517, at *2. Steib's error in not adhering to the requirements of Rule 74.04 was clear and unmistakable error. The law mandating timely notice in claims-made policies requires that we give effect to the contractual reporting requirement in the Policy's insuring clause by holding Steib accountable for not notifying The Bar Plan of Decedent's potential malpractice claim when submitting his Policy renewal application. See

---

[4] Ruiz suggests that the probate court's approval of his request for attorneys' fees against Decedent's estate—and the lack of a counterclaim by Decedent's estate—provided him a reasonable belief that no claim would be raised against him resulting from his representation of Decedent.

13

Wittner, 969 S.W.2d at 754; Grissom, 371 S.W.3d at 874; Landry, 292 S.W.3d at 356; see also Bryan Bros. Inc., 660 F.3d at 831; Lexington Ins. Co., 88 F.3d at 634.

Ruiz suggests that this plain-meaning interpretation of the Policy's reporting requirement places too onerous a burden on an attorney in Steib's position to recognize and report errors. We find this argument unavailing. Although not binding on this Court, we find instructive The Bar Plan's proffered Seventh Circuit case rejecting this same assertion with respect to one of its policies. While acknowledging that in some close cases, "[i]t may well be difficult to determine exactly when an act or omission 'might reasonably be expected to be the basis of' a malpractice claim," this case, like that in Koransky, is "not a close one." 712 F.3d at 343. In Koransky, not only did the attorney's error of failing to deliver the sales contract cause the sale to fall through, but after continued litigation, the attorney was clearly put on notice of the possibility of a malpractice claim when the state court held no contract had been formed due to his error. Id. at 343–44. Similarly, prior to the Policy renewal application, Steib was informed of the enormity of his error by both the trial and appellate courts. In granting Intermed's motion for summary judgment, the trial court poignantly explained that Steib's failure to respond to Intermed's statement of uncontroverted facts in compliance with Rule 74.04(c)(2) constrained its ruling, requiring it to take Intermed's facts as undisputedly true and, accordingly, rule against Decedent. See Rule 74.04. On appeal, our memorandum again emphasized that the judgment against Decedent resulted from Decedent's failure to admit or deny each factual statement contained in the summary judgment motion as required by Rule 74.04. Between the obvious nature of Steib's error in failing to comply with Rule 74.04, and the courts' decisions emphasizing the binding consequences of Steib's error, we resolutely reject any suggestion that Steib could not reasonably be expected to have anticipated a legal malpractice claim. The record fully supports the trial

court's finding that Steib was required to notify The Bar Plan of his acts and omissions under the reporting requirement in the Policy's insuring clause.

Having found that a reasonable attorney in Steib's position would have reason to know that his failure to adhere to the requirements of Rule 74.04 in the Intermed declaratory judgment action might give rise to a legal malpractice claim, we next turn to Ruiz's principal argument that, regardless of the consequences of Steib's error, he had no duty to report his acts and omissions in the Intermed matter because Decedent's death preceded the Policy renewal application, thereby abating any legal malpractice claim Decedent may have had.

B.      Decedent's death did not excuse the Policy's reporting requirement

Ruiz posits that Steib's failure to notify The Bar Plan of Decedent's potential legal malpractice claim did not breach the Policy's notice requirement because Decedent died before Steib applied to renew the Policy. Ruiz's argument that Decedent's death abated a possible cause of action for legal malpractice against Steib was firmly rejected by this Court in Roedder v. Callis, 375 S.W.3d 824, 831 (Mo. App. E.D. 2012). Ruiz acknowledges our holding in Roedder that legal malpractice claims in Missouri survive a client's death but suggests Roedder constituted a change in the law with regard to the survival of legal malpractice claims that a reasonable attorney could not have predicted in 2008. 375 S.W.3d at 831. Within that framework, Ruiz offers pre-Roedder case law examining the non-assignability of legal malpractice claims and relies upon this case law to maintain that Steib (or any practicing attorney in 2008) reasonably would have believed that any potential legal malpractice claim abated upon Decedent's death. We are not persuaded of the merits of Ruiz's argument.

In the uncommon circumstance that a case actually changes the law, rather than just clarifies or distinguishes it, we do not expect that an objectively reasonable attorney should anticipate that change and preemptively conform his conduct accordingly. Cf. Hoeber v. State,

15

488 S.W.3d 648, 658 (Mo. banc 2016) (internal quotation omitted) (noting in a post-conviction relief case that counsel will not be held ineffective for failing to anticipate a substantive change in the law); Fogelsong v. Joe Machens Auto. Grp., Inc., 564 S.W.3d 393, 398–99 (Mo. App. W.D. 2018) (noting it is "the rare case in which, during the course of the pendency of the appeal, the applicable law was not just clarified or distinguished, but the law actually changed").

But Roedder did not announce any decisional change in the law. Roedder merely applied existing principles of the survivability of personal injury actions to legal malpractice claims. 375 S.W.3d at 827–31 (internal citations omitted). In fact, Roedder presents a thorough discussion of the long-standing expansive coverage of Missouri's survival statute to include not only claims of physical personal injury but also claims of injury to personal rights. See id. Roedder explained that the Supreme Court of Missouri in 1958—fifty years before Steib submitted his Policy renewal application—rejected a narrow reading of the survival statute. Id. at 827–28 (citing Gray v. Wallace, 319 S.W.2d 582, 584 (Mo. 1958)). Rather, the Supreme Court in Gray concluded that in enacting the Missouri survival statute, "the legislature intended that the term 'personal injuries' was to include all actions for injuries to the person whether to the person's rights or to his body." Roedder, 375 S.W.3d at 827–28 (quoting Gray, 319 S.W.2d at 584 (citing Sections 537.020, .030, RSMo 1949)). The Supreme Court in Gray held that malicious prosecution constituted a personal injury within the meaning of the Missouri survival statute, and because malicious prosecution was not specifically excepted from survival by Section 537.030— which excludes only slander, libel, assault and battery, or false imprisonment—a claim for malicious prosecution did not abate by reason of the death of a party. 319 S.W.2d at 585–86 (citing Sections 537.020, .030, RSMo 1949). Importantly, as noted by this Court in Roedder,

16

Gray required that the term "personal injury" as used in the survival statute be construed in "its broadest and most comprehensive sense[.]" Roedder at 827 (quoting Gray, 319 S.W.2d at 584).

Gray's admonition that the breadth of the survival statute reached beyond claims for pure physical injuries to include claims for injuries to personal rights was clearly established and recognized long before 2008. 319 S.W.2d at 584. Also, as noted by this Court in Roedder, legal commentators, many years before 2008, discussed the growing modern trend discerning the survival of tort causes of action and liabilities to a plaintiff's estate—including the specific recognition that legal malpractice claims survive the client's death and may be pursued by the client's personal representative or heirs. Roedder, 375 S.W.3d at 829 (citing WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS 901 (4th ed. 1971)).

To counter the very clear dictates of Gray, which Ruiz does not discuss, Ruiz directs this Court to cases involving the assignability of legal malpractice claims. See Freeman v. Basso, 128 S.W.3d 138, 142 (Mo. App. S.D. 2004); White v. Auto Club Inter-Ins. Exch., 984 S.W.2d 156, 160–61 (Mo. App. W.D. 1998). We acknowledge that Missouri case law has observed a correlation between the assignability and the survivability of some claims in some circumstances. See State ex inf. Peach ex rel. Stitz v. Perry, 643 S.W.2d 878, 880 (Mo. App. E.D. 1982) ("One test of whether or not a cause of action abates [is] whether it is assignable."). We also agree that "[l]egal malpractice claims are not now and have never been assignable in Missouri." Freeman, 128 S.W.3d at142 (citing White, 984 S.W.2d at 160–61). But that fact does not alter the unequivocal dictate in Gray to apply the survival statute in its broadest and most comprehensive manner. 319 S.W.2d at 584. Here, the issue of assignability is nothing but a distraction and diversion from the core issue before us. Ruiz's argument fails because the common law principles of assignability are not the determining factor in the survival of legal

malpractice claims. Gray made transparent that Missouri's survival statute and its statutory construction are the key components as to whether a reasonable attorney in 2008 should have been aware that a legal malpractice claim of a client would survive to the client's estate following the client's death. See id.[5]

In addition to neglecting Gray and identifying no change in the law by Roedder, Ruiz predicates her argument on a mistaken understanding that the assignability of a claim solely determines the survivability of that claim. To the contrary, Missouri case law pre-dating Roedder plainly instructs that the *assignability* of a claim involving personal rights to a *third party* is a separate legal principle from those principles governing the survival of a claim to a *decedent's estate*. See, e.g., Forsthove v. Hardware Dealers Mut. Fire Ins. Co., 416 S.W.2d 208, 215–17 (Mo. App. S.T.L. 1967). Although one test for whether a claim is assignable is whether it survives, see, e.g., Adams v. Cossa, 294 S.W.3d 101, 105 (Mo. App. E.D. 2009); Forsthove, 416 S.W.2d at 213, the reverse is not necessarily true. It does not logically follow that a claim cannot survive because it is non-assignable, and Ruiz offers no case law supporting this position. Indeed, in advancing her abatement theory to rationalize Steib's non-reporting of Decedent's potential claim, Ruiz identifies no cases holding legal malpractice claims abate. Ruiz's argument conflating the separate mechanisms of assignment and survival is fundamentally misguided because Missouri cases far earlier than Roedder—as early as 1967—made clear that assignability

---

[5] Like Ruiz, the dissent does not acknowledge nor discuss Gray v. Wallace, 319 S.W.2d 582, 584 (Mo. 1958), wherein the Missouri Supreme Court clearly rejected a narrow reading of Missouri's survival statute and instructed that the survival statute applied to *all actions for personal injury, including all actions for injuries to the person, whether to the person's rights or to his body*, unless expressly excepted by the statute. This Court's decision in Roedder did not create any new principle of law, but merely reaffirmed the existing law regarding the survivability of claims for personal injuries. It is difficult to see how an objectively reasonable attorney would not recognize the survivability of legal malpractice claims after Gray. Roedder was not required to put any member of the bar on notice that a claim for legal malpractice survived the death of the client under Missouri's survival statute. The Supreme Court put attorneys on notice of that inevitability in 1958. The majority opinion does not create a standard requiring practicing attorneys to anticipate and foresee changes in the law, but simply applies the objectively-reasonable-attorney standard to the particular facts of this case.

18

does not determine survivability: "[o]bviously, [the Supreme Court's] reason for its pronouncement of the rule [of the non-assignability of personal injury actions] is not the non-survivability of personal injury actions after the death of the injured party[.]" Forsthove, 416 S.W.2d at 215. Forsthove expounded that while non-survivability is *one* test for non-assignability, public policy provides another: "We reject the rule . . . that whether a cause of action for personal injury is assignable depends solely upon whether it survives and adopt the rule that such causes of action may not be assigned prior to judgment for reasons of public policy." Id. at 217. Such public policy reasons include concerns "that unscrupulous people would purchase causes of action and thereby traffic in lawsuits for pain and suffering." Id. While Ruiz cites pre-2008 case law holding that legal malpractice claims were unassignable on public policy grounds, she cites no cases holding that said claims are not assignable on survival grounds. See Freeman, 128 S.W.3d at 143; White, 984 S.W.2d at 160.

Ruiz offers White and Freeman as guidance. Both cases ruled that legal malpractice claims are not assignable. Freeman, 128 S.W.3d at 143; White, 984 S.W.2d at 160. We consider what an objectively reasonable attorney would infer from White and Freeman as to whether a legal malpractice claim could be brought by a deceased client's estate. We first note that White, a 1998 case, and Freeman, a 2004 case, support their holdings by citing a California case in which the legal principle was well-established that a client's estate was authorized to pursue a client's legal malpractice claim after the client's death. Freeman, 128 S.W.3d at 142 (citing White, 984 S.W.2d at 160 (citing Goodley v. Wank & Wank, Inc., 62 Cal. App. 3d 389, 393 n.3 (Cal. App. 2d 1976))). In White, the Western District noted that the California case—the leading case on the *assignment* of legal malpractice claims at the time—made persuasive public policy concerns and solidified the majority position that such claims are not assignable to third parties.

19

984 S.W.2d at 160 (citing Goodley, 62 Cal. App. 3d at 393 n.3). Notably, neither White nor Freeman holds or even remotely suggests that an estate may not lawfully pursue a legal malpractice claim on behalf of the deceased client, nor does their public policy rationale suggest that this Court equates non-assignability with non-survivability. See Freeman, 128 S.W.3d at 142; White, 984 S.W.2d at 160.

The case law development in Missouri clearly informed members of the bar of the expansive reach of the survival statute long before 2008. See, e.g., Gray, 319 S.W.2d at 584. No cases preceding Roedder ever held that a client's estate could not bring a legal malpractice claim, nor has an action for legal malpractice been expressly excepted from Missouri's survival statute. See Section 537.030. Roedder merely applied the well-recognized and attested principle that the purview of Missouri's survival statute was not limited to claims of physical personal injury but also reached any injury of personal rights not expressly excepted by the survival statute. 375 S.W.3d at 827–30 (internal citations omitted). Thus, Roedder cannot provide Steib a legal shield against the Policy's reporting requirement under the objectively-reasonable-attorney standard. See id.; see also Hoeber, 488 S.W.3d at 658–59 (citing State v. Celis–Garcia, 344 S.W.3d 150 (Mo. banc 2011)) (finding that counsel was not insulated from advancing the arguments discussed in Celis–Garcia where the case merely reiterated established legal principles and did not substantively change the law). As explained in the preceding discussion, Ruiz's claim is particularly unconvincing in light of the default reporting requirement and the fact that Ruiz offers no pre-2008 Missouri case law suggesting that legal malpractice claims *did not* survive the death of the claimant. See Hill v. Mo. Dep't of Corr., 570 S.W.3d 95, 102 (Mo. App. W.D. 2018) (internal citations omitted) (rejecting an appellant's claim that an opinion interpreting the definition of 'dangerous felony' changed the law and should be excepted from retroactive

20

application where appellant identified no pre-existing or conflicting cases interpreting 'dangerous felony' in any manner differently at the time of appellant's offenses). Consequently, we are not convinced that Roedder's holding regarding the survivability of a legal malpractice claim to claimant's estate substantively changed any law so as to release Steib from his obligation to notify The Bar Plan of the potential malpractice claim on the Policy renewal application.

Moreover, as discussed above, notice to the insurer is the default for coverage under a claims-made policy. See Wittner, 969 S.W.2d at 752, 754; Grissom, 371 S.W.3d at 874; Landry, 292 S.W.3d at 356; see also Bryan Bros. Inc., 660 F.3d at 831; Lexington Ins. Co., 88 F.3d at 634. Thus, if there exists any doubt about the possibility of a claim, a claims-made policy directs the attorney err on the side of providing notice. Even if an attorney subjectively believes there is a good-faith defense to a potential legal malpractice claim, a claims-made policy does not excuse *failing to put the insurer on notice of that claim*. See Wittner, 969 S.W.2d at 754; see also City of Brentwood, Mo., 397 F. Supp. 2d at 1148; Vintila, 1:15-CV-14 SNLJ, 2016 WL 3031407, at *4; Gen. Star Nat. Ins. Co., 05-0631-CV-W-HFS, 2007 WL 2782517, at *2. As we consider Steib's obligations to The Bar Plan, we must review the record and case law through the lens of an objectively reasonable attorney. See Wittner, 969 S.W.2d at 754. We reject the argument that an objectively reasonable attorney in 2008 would have presumed that a client's legal malpractice claim *automatically* abated upon the client's death. Let us assume that Steib believed he could somehow distinguish a claim of legal malpractice from the types of personal rights tort cases subsumed within the survival statute under Gray. 319 S.W.2d at 584 (citing Section 537.020, .030, RSMo 1949). Even then, we are unwilling to conclude that a reasonable attorney in 2008 would not have recognized the very real possibility, if not substantial likelihood,

that a court, when asked, would apply the principles and holding of Gray to claims of legal malpractice. See id. As a logical extension of that holding, we reject Ruiz's suggestion that Steib was not required to notify his insurer of his act or omission that *could possibly* give rise to a legal malpractice claim because his client had died. The case law relating to the assignability of legal malpractice claims simply provides no reasonable basis for Steib to have concluded that his client's death protected him from a legal malpractice claim by his client's estate. Ruiz uses the issue of assignability in an attempt to excuse Steib's inexcusable failure to report the potential claim of legal malpractice stemming from his representation of Decedent. As disturbing as the impact of Steib's conduct is on Ruiz's ability to recover for Decedent's estate, The Bar Plan is not at fault and has not breached the terms of the Policy or wrongfully failed to honor the terms of the Policy. Because Decedent's death had no impact on the viability of the potential legal malpractice claim against Steib, we find the Policy's insuring clause and Exclusion L prohibit coverage.

C.    Summary

Because Steib did not notify The Bar Plan of any errors or omissions in his representation of Decedent in the Intermed declaratory judgment action, the Policy provides no coverage for any of Ruiz's claims arising out of Steib's representation—including Ruiz's allegations that Steib failed to properly respond to the statement of uncontroverted facts in the summary judgment motion (Points One and Two) or that Steib failed to cite the proper law to avoid summary judgment (Point Three). See Taylor, 457 S.W.3d at 345; Wittner, 969 S.W.2d at 754; Grissom, 371 S.W.3d at 874. The law simply does not allow this Court to hold the Bar Plan liable for Steib's failure to adhere to the notice requirements of the policy renewal application. Accordingly, the trial court properly granted summary judgment to The Bar Plan on Ruiz's equitable garnishment claim as a matter of law. See Taylor, 457 S.W.3d at 344. We deny Points

22

One, Two, and Three. Because our holding that the Policy affords no coverage for Ruiz's claims is dispositive of Ruiz's BFFS claim, we deny Point Four.

## Conclusion

The judgment of the trial court is affirmed.

KURT S. ODENWALD, Presiding Judge

Robin Ransom, J., concurs.
Gary M. Gaertner, Jr., J., dissents in a separate opinion.

23



# In the Missouri Court of Appeals
## Eastern District
### DIVISION FOUR

ELIZABETH A. RUIZ, PERSONAL ) No. ED106926
REPRESENTATIVE OF THE ESTATE OF )
MARCIA A. PAUL, )
    Appellant, ) Appeal from the Circuit Court
     ) of St. Louis County
vs. )
     ) Honorable David L. Vincent, III
THE BAR PLAN MUTUAL INSURANCE )
COMPANY, )
    Respondent. ) FILED: September 3, 2019

### DISSENT

I respectfully dissent.

The attorney filed his application for legal malpractice insurance on December 9, 2008. We know for certain on that date: (1) the attorney had committed legal malpractice with his deficient summary judgment response; (2) legal malpractice cases were not assignable in Missouri because it was against public policy; (3) no Missouri case had ever held that a legal malpractice action is survivable; (4) no Missouri case had even referenced the survivability of a legal malpractice action in any other context; and (5) the injured party was dead.

In 2012 more than three years after the attorney in this case filed his application for legal malpractice insurance with The Bar Plan, Judge Patricia L. Cohen wrote the very thorough, concise, and well-researched opinion, Roedder v. Callis, 375 S.W.3d 824 (Mo. App. E.D. 2012) which addressed the issue presented here for the first time in Missouri jurisprudence. In Roedder,

Judge Cohen held that legal malpractice actions are survivable. <u>Id.</u> at 831. Given the state of Missouri law on December 9, 2008, an objectively reasonable attorney would not have thought that a legal malpractice action survived, notwithstanding the fact that more than three years later in 2012 this Court would rule that way for the first time. My concern is that the majority opinion creates a standard which forces attorneys to anticipate and foresee changes in the law.

_____
GARY M. GAERTNER, JR., Judge

2